Thomas MINCH, Appellant,

v.

DISTRICT OF COLUMBIA, Appellee.

No. 04–CV–1397.

District of Columbia Court of Appeals.

Argued March 14, 2006.

Decided July 17, 2008.

Joel M. Finkelstein, for appellant.

Michelle C. Pardo, Special Assistant Attorney General for the District of Columbia, with whom, Edward E. Schwab, Deputy Attorney General at the time the brief was filed, and Mary T. Connelly, Assistant Attorney General, were on the brief, for appellee.

Before RUIZ and KRAMER, Associate Judges, and PRYOR, Senior Judge.

RUIZ, Associate Judge:

Thomas Minch appeals the trial court's grant of summary judgment for the District of Columbia in his civil suit for false arrest, false imprisonment, defamation, and intentional and negligent infliction of emotional distress. The claims arise from Minch's arrest and overnight detention early in the investigation of the murder of Gallaudet University student Eric Plunkett. Joseph Mesa has since been convicted for the murder. Because the police acted in good faith and within the scope of their duties when they arrested and detained appellant, and issued a press release to that effect, we agree that the District of Columbia was entitled to judgment as a matter of law, and affirm.

## I.

### Facts Surrounding the Murder Investigation

In September 2000, Eric Plunkett was murdered by Joseph Mesa—although the murderer's identity would go undiscovered for over four months, during which time he killed another Gallaudet University student. *See Varner v. District of Columbia,* 891 A.2d 260, 264 (D.C.2006) (summarizing facts surrounding the deaths of Gallaudet University students Eric Plunkett and Andrew Varner). On Thursday, September 29, 2000, around 9 p.m., students entered Plunkett's dorm room to check up on him after not having seen or heard from him all day. To their horror, they discovered his lifeless body lying in a blood-splattered room. Plunkett's body was transported to D.C. General Hospital where the medical examiner pronounced him dead and ruled the cause of death as homicide. The autopsy report concluded that Plunkett died from "Blunt Force Trauma and a Broken Neck." The medical examiner believed that the suspect had used a chair in the room, "which was blood spattered," to kill Plunkett.

On Friday, September 29, Detective Kyle Cimiotti and other detectives under his supervision interviewed an estimated eleven students in the dorm. A number of students told the police that Plunkett was gay, and was a member of the gay and lesbian club on campus. The detectives

also interviewed Eric Plunkett's family, specifically asking them about Eric's computer, which was turned on and logged in when his body was found. The family said that Eric used the digital camera that was attached to the laptop to videoconference with them. His mother told the police that Plunkett "suffer[ed] from a mild case of Cerebral Palsy."

On Saturday, September 30, two days after Plunkett's body was found, the detectives continued interviewing students. One witness, whom the police identified as "W–1," told the police that Plunkett had a romantic relationship with "Thomas B." When the police later reinterviewed W–1, along with another witness (W–2), the second witness told the police that Thomas' last name began with "M" and not "B." After going through the school roster, the police presented W–2 with a photo of appellant, Thomas Minch. The witness positively identified Minch as the person who was involved with Plunkett.

### Minch's Interview

On October 3, 2000, five days after Plunkett's body was discovered, Detective Cimiotti, along with two sign-language interpreters, approached Minch in the school cafeteria, where Minch agreed to an interview. Minch, who was then eighteen years old, had just entered Gallaudet's freshman class a few weeks earlier. Minch testified that he was taken to MPD's Fifth District station, where the detective "immediately started bombshelling [him] with questions" during an interview that lasted six hours. According to Minch, the detective told him he was under arrest, but "[he] wasn't sure if [the detective] said that because he was trying to get some response out of [him], or something

else." Minch explained that he did not ask for a lawyer or call his parents because "[he] was under the assumption that [he] was just being questioned and that [he] would be able to leave."[1]

Minch testified that Detective Cimiotti threatened him:

> I remember that [the detective] said that if I didn't confess to anything, that I'd be put in jail for life—that I'd be put in jail for life, and that when I got out of jail, that people would think that I was a murderer. At that point, I felt sort of threatened.
>
> . . . .
>
> [Detective Cimiotti] said that if I didn't confess to the crime that I would be put in jail for some length of time. And that when I got out, people would still think that I was gay, A, and that I was a murderer, B, and they would think all sorts of bad things about me.

Although Minch claimed that it was his "impression that [he] could not use the bathroom," he admitted that Detective Cimiotti told him "at the beginning" that he could take breaks. Minch also acknowledged that there were breaks in the interview "every five to ten questions," when Detective Cimiotti would leave and then return to continue the questioning, and that the detective "offered to get me something, at the beginning, from the vending machine" to eat, as well as food from McDonald's at the end of the interview. Minch said in his deposition that "[i]t's been three years and I don't remember all the questions that [the detective] had." Minch also recalled being unclear at the time of the interview about "some of the questions," and that he "didn't feel like there was enough explanation."

1. On appeal, Minch acknowledges that he consented to the interview, but represents that "had he known what was in store for him at the Fifth District at the hands of Detective Cimiotti, he would not have agreed."

Minch had an alibi for the night that Plunkett was killed. According to Detective James LaFranchise, Minch had told Detective Cimiotti that "he'd been at the theater as an assistant stage manager the night that this all happened." Minch confirmed telling the detective that "I walked back to the dorm" after the rehearsal, although he could no longer "even recall what I did, after I got back." Minch, however, did admit in his deposition that he did not tell Detective Cimiotti that he went to Plunkett's room when he returned to the dorm after the rehearsal.

In his deposition, Minch also admitted that "at the beginning I said no, that I hadn't [had a sexual encounter with Plunkett, but that l]ater, I told him that we had a one time thing and that was it." Minch told Detective Cimiotti that he had "pushed" Plunkett in his room, because Plunkett "was trying to make some sexual advances on [him]." Minch also said that Plunkett "stumbled backward" but that he did not "fall on the ground," and Minch then "ran out of the room." But it is not clear from the deposition whether Minch is talking about what he now recalls having *done* or what he now recalls having *said* to Detective Cimiotti.

Minch contends on appeal that his altercation with Plunkett was not on the day of the murder. In his deposition, however, he said that he cannot, either "remember when it happened" or what he told the police about when it happened. He agreed, however, that "it would have been reasonable for [Detective Cimiotti] to be-

lieve that this pushing incident occurred the day before—sometime the day before Plunkett's body was found."

Minch's deposition testimony concerning the interview was supplemented by the MPD sign-language interpreters, Kevin Campbell and Vicki Mather,[2] who were present at the interview.[3] According to Campbell,

Detective Cimiotti ... reiterated that Mr. Minch was not under arrest, and began questioning Mr. Minch. Detective Cimiotti asked Mr. Minch about his whereabouts on Wednesday evening the night before Mr. Plunkett was found. In general Mr. Minch was saying he was not there that Wednesday; his last contact with the decedent was two weeks prior.... Mr. Minch denied having any sexual relations with Mr. Plunkett.

Detective Cimiotti indicated that Mr. Minch was lying, that he had gathered evidence and talked to over a hundred individuals all of whom said that Mr. Minch knew Eric Plunkett and had a sexual relationship at least once with him ... he wanted to give Mr. Minch the opportunity to think about what he just said and Detective Cimiotti and myself and Vicki Mather left the room for a time.

... Detective Cimiotti asked Mr. Minch if he ever had any desire or was ever attracted to another man. Mr. Minch responded, "Never."

Detective Cimiotti stated that Mr. Minch was lying, that there were people who knew that there was at least one sexual

---

2. Ms. Mather testified that she and Mr. Campbell worked together.

 Q. During the interview, were both you and Mr. Campbell interpreting?

 A. We were functioning as a team. We continuously monitor each other for accuracy and make sure all of the information is conveyed.

 Q. Basically you both are there as check and balances?

 A. Exactly. Two of us work together to protect the integrity of the interview.

3. Detectives LaFranchise and William Hamann interviewed the interpreters, and wrote the reports that were submitted for summary judgment.

encounter between Mr. Minch and Mr. Plunkett. Mr. Minch indicated that they had only touched each other and that was all . . . . and that . . . two weeks ago [was] the last time he saw Mr. Plunkett.

Det. Cimiotti said that Mr. Minch was lying, that again people told him that there was at least one sexual encounter between Mr. Minch and Mr. Plunkett. Mr. Minch admitted that he was curious and had one sexual encounter which involved a blow job with Mr. Plunkett but afterwards Mr. Minch realized that activity was stupid and he did not like men that way.

. . . Minch stated that he was the assistant stage manager for a theater production and he was at the theater the night that it happened.

Mr. Minch became very nervous, shaking, covering his face, and Detective Cimiotti offered his hand, encouraging Minch to come clean to admit he did it. Minch asked, if I tell you what happened that night, what will happen to me. Minch stated that he was in the room Wednesday evening, that Minch was looking at a poster he had given Plunkett for his birthday when Plunkett came up behind Minch and started to touch him. . . . Minch said he could not change his mind and started to leave. Plunkett grabbed him. Minch pulled away. Plunkett asked him not to leave. Plunkett followed Minch out the door and grabbed him again. Minch stated that was when he pushed Plunkett and Plunkett fell to the floor. Minch said that was when he left, immediately.

After Minch made that statement, he was Mirandized.

. . . [Q:]How was Minch treated by Detective Cimiotti[?]

[A:] Very kindly, encouraging him to tell the truth, supportive.

The report from Mather, the other interpreter, is almost identical to Campbell's, so we highlight only the additional information in her report:

He [Minch] said he was at the theater for play rehearsals during the murder. He was asked when the murder happened and how he knew that. He replied that he was at the theater on Thursday night when the news of the murder broke and he was shocked by it. When the Det. told him it had occurred on Wed. he said he had been at the theater both nights.

\* \* \*

He continually pounded on the table to illustrate his anger and declared that he was not gay. He was very concerned that everyone know he was straight. Before admitting to being in Eric's room or hitting Eric he asked what his punishment would be. The Det. told him he would be right in the eyes of the Lord and he would feel better once he admitted it. The Det. offered to pray with Thomas. They said the Lord's Prayer together.

\* \* \*

Throughout the interview, Thomas repeatedly denied having contact with Eric after the encounter two weeks before until confronted by the detective who indicated that he had witness statements placing Thomas with Eric the night of the murder. The detective also indicated that the web cam on the decedent's computer had been on and there were bloody finger prints on the wall.

Mather also noted that Detective Cimiotti clarified his questions whenever Minch said they were confusing and that "several times during the questioning

[Minch] would admit to something and then later revert to his previous story."

## Minch's Arrest, Detention, and Release

According to Detective Cimiotti, during the course of the interview, when Minch became nervous and agitated, he encouraged Minch to "come clean [and] ... admit he did it." They prayed the Lord's Prayer together and Minch said, "I did it." The detective consulted with his supervisor, who had been watching parts of the interview via closed circuit camera, and they determined that there was probable cause to arrest. Minch was arrested, *Mirandized*, and detained at the Fifth District holding cell overnight. Although there is no record of Minch's mental condition—except from what can be gleaned from his comments and actions during the police questioning—in Minch's arrest report, the word, "SUICIDAL," was written in bold print at the top.[4] MPD released news of Minch's arrest and detention:

> At approximately 5:30 p.m. tonight, an arrest was made at the Fifth District. Arrested was 18–year–old Thomas Minch, a freshman at Gallaudet University from Greenland, New Hampshire. He is charged with Murder II in the death of Eric Plunkett and will be arraigned tomorrow at DC Superior Court. A subsequent investigation revealed that Mr. Minch and Mr. Plunkett were apparently involved in a physical altercation over a personal dispute when Mr. Plunkett was killed.

A headline in the next day's (October 4) *Washington Post* announced, "Friend Held in Gallaudet Slaying." The story continued:

Thomas Minch, of Greenland, N.H., was arrested at 5:30 p.m. at 5th District headquarters and charged with second-degree murder, police said. The two young men—both freshmen at the University—had a dispute that erupted into a physical altercation, ending with Plunkett's death, police said. They would not say what the dispute was about, but said they think a chair in the room may have been used to kill Plunkett.

The *Post* story recounted that Gallaudet students who knew Minch and his friends were in "shock" and "couldn't believe it was him."

Minch was taken to Superior Court for arraignment, but the prosecutor determined that there was no probable cause, and refused to file formal charges. Minch was immediately released. Again the *Post* ran a story, on October 5, announcing that "District of Columbia police and prosecutors dropped murder charges against Gallaudet University freshman Thomas W. Minch in a dramatic and unusual hearing yesterday," where the prosecutor said that "after careful analysis of all the facts" she could not go forward with the case. According to the *Post* article, "[s]enior police executives said detectives acted prematurely in arresting Minch, but they made clear his release may be only an unusual chapter in a bumpy investigation." The *Post* quoted the Executive Assistant Police Chief, "I suspect Mr. Minch believes he is owed an apology, but I think our officers made a reasonable judgment." After he was released, Minch returned home to New Hampshire with his parents. He remained under suspicion, however, and was

---

4. Detective LaFranchise learned that Minch "had a temper apparently," after speaking to his classmates. The detective also said that "[w]ith Gallaudet students though ... I don't know if it was prevalent, but you know, some of the kids, there are a lot of, there are several calls to Gallaudet for suicide attempts."

suspended from the University.[5] *Varner*, 891 A.2d at 263.

### The Continuing Investigation

Although the detectives prepared a search warrant for Plunkett's computer by early October, MPD did not follow up on that lead for almost a month, and warrants for Plunkett's e-mail, AOL, screen names, and discs found in the room were not filed until October 19–25, 2000. As we noted in *Varner*, data on the computer would eventually confirm that Mesa "had used Mr. Plunkett's computer and Internet account and credit card to order bikes and have [them] delivered to his mailing address." *Varner*, 891 A.2d at 274.

According to Detective LaFranchise, who was ordered to take over the investigation from Detective Cimiotti after the charges against Minch were dropped, the forensic evidence "pretty much" exonerated Minch as a suspect, as the hair sample found in the crime scene did not match Minch's hair (nor did it match the hair of the real culprit, Mesa), and there were no blood samples—other than Plunkett's—recovered from the scene. That forensic evidence did not become available, however, until several months after Plunkett was murdered.

When Benjamin Varner was murdered at Gallaudet, the police investigation—this time led by Detective Pamela Reed—quickly focused on the fraudulent use of Varner's checks by Joseph Mesa, who confessed to both murders soon thereafter. *See Varner*, 891 A.2d at 264.[6]

### II.

■ We review the grant of summary judgment *de novo*. *See Blackman v. Visiting Nurses Ass'n*, 694 A.2d 865, 868 (D.C.1997). Summary judgment is proper if there are no disputed issues of material fact and a party is entitled to judgment as a matter of law. *See id.* In ruling on a motion for summary judgment, "evidence is viewed in the light most favorable to the party opposing the motion, . . . and that party is entitled to all favorable inferences which may reasonably be drawn from the evidentiary materials." *Beard v. Goodyear Tire & Rubber Co.*, 587 A.2d 195, 198 (D.C.1991) (citation omitted). However, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided . . ., must set forth specific facts showing that there is a genuine issue for trial." *Id.* at 199 (quoting Super. Ct. Civ. R. 56(e)).

■ In the trial court and on appeal, the District of Columbia contends that it was entitled to summary judgment on the claims of false arrest, false imprisonment, and defamation because the officers' actions came within the purview of official immunity.

Absolute official immunity operates to bar the plaintiff's action from the outset of the suit. . . . [W]hether the act in question is subject to official immunity is an issue for the court, appropriately raised . . . in a motion for summary judgment under Super. Ct. Civ. R. 56, . . . however, the burden of establishing

---

5. Minch stated that he went to New Hampshire "[b]ecause I didn't feel safe in D.C." and "[b]ecause Gallaudet threw me off campus and I had nowhere to go." He eventually enrolled in another university.

6. After appellant's release, the police discovered more evidence which incriminated Joseph Mesa. At least one other witness, however, contacted police after appellant was released and anonymously tipped them to a tempestuous love triangle among appellant, Eric Plunkett, and a third young man.

that the official function in question merits absolute immunity rests on the defendant official.

*Moss v. Stockard,* 580 A.2d 1011, 1020–21 n. 18 (D.C.1990); *see also Liser v. Smith,* 254 F.Supp.2d 89, 101 n. 4 (D.D.C.2003). We have recognized that "[t]he application of the directed verdict test to the issue of probable cause results in a curious double perspective that can make this case difficult to apprehend conceptually." *District of Columbia v. Murphy,* 631 A.2d 34, 37 n. 4 (D.C.1993).

> On one hand, probable cause must be assessed in terms of the information known to the officers. Indeed, as we have indicated, the substantive standard for determining probable cause—on which the jury was instructed—focuses upon the reasonable, good faith *belief* of the officers. But, on the other hand, because the District is claiming that it was entitled to a directed verdict, the evidence of that belief and its reasonableness, given the information available to the officers, must be assessed in the light most favorable to [the plaintiff].

*Id.*

### A. False Arrest and Imprisonment

 The Metropolitan Police Department is immune from claims for both false arrest and false imprisonment if it can affirmatively demonstrate either that probable cause existed to arrest *or* that the arresting officer believed, reasonably and in good faith, that probable cause existed. *See Murphy,* 631 A.2d at 36; *Liser,* 254 F.Supp.2d at 95–96. "[P]robable cause ... is ordinarily a mixed question of law and fact; however, where the facts are not in dispute," or where, as here, the summary judgment standard precludes the trial court from evaluating the relative merits of competing evidence, "the issue becomes a purely legal one which the Court can answer on its own." *See Liser,* 254 F.Supp.2d at 96.

The trial court agreed with the judgment of the U.S. Attorney who dismissed the charges against appellant that, as a matter of law, the police report, "standing alone, ... does not support a finding of probable cause." Considering in the alternative whether the arresting officer in good faith believed there was probable cause, the trial court observed that "the [police report] cannot be considered in isolation," and that considering the totality of the circumstances—and pointing in particular to appellant's shifting and incriminating statements during the interview, and his becoming "really upset (like a lunatic) during the interview ... and continuously pounded the table"—the court ruled:

> Under all of these circumstances, the Court finds a prudent and experienced police officer could reasonably have believed that there was probable cause to arrest Plaintiff.
>
> In making this finding, the Court does not find that Det. Cimiotti had conducted a thorough or professional investigation of decedent's murder prior to Plaintiff's arrest.

 We agree on both points. Although appellant disputes Detective Cimiotti's account of what he told the detective during the interview—particularly whether he told the detective that he was at the theater and had not seen Plunkett on the night of the murder—he does not dispute what Detective Cimiotti perceived through observing appellant's demeanor and hearing appellant's answers as conveyed to the detective by the ASL interpreters.[7] On the question of whether ap-

---

7. Appellant did not challenge the interpreters' qualifications to accurately translate the spoken word to sign language and vice-versa. In the absence of a dispute about the interpreta-

pellant told the detective that he was at the theater and had not seen Plunkett on the night that he was killed, both interpreters concurred. MPD's initial determination that appellant had been involved in the murder turned out to be completely mistaken, but the error—tragic though it was in terms of its impact on appellant— was not "the product of the government's willful ignorance [or] investigative negligence." *Liser,* 254 F.Supp.2d at 97. Particularly when considering that it was made at the beginning of an investigation, it was "an objectively reasonable mistake." *Id.* The reasonableness of MPD's suspicion was based to a great extent on appellant's evasiveness and equivocation during the questioning: from denying that he even knew Eric Plunkett, to admitting that he had had a sexual relationship with him, to saying that he was angry and hit him the night of the murder—all within the course of a single interview. Even though the investigation was still in its early stages, Detective Cimiotti was confronted with the choice of detaining or releasing an interviewee who had talked his way into becoming the lead suspect. He discussed the matter with his supervisor before arresting appellant. When the U.S. Attorney reviewed the evidence the next day and decided that it was insufficient to detain appellant on probable cause, he was immediately released. Based on the undisputed evidence of record, we conclude that it establishes, as a matter of law, that the officers' actions were taken in good faith and on the reasonable—though mistaken— belief that they had probable cause to arrest appellant. *Cf. id.* at 98 (noting "crucial point ... that this was not a fast moving investigation in which the officers were called upon to make snap judgments based on limited information" where defendant was not arrested until three months after officers had information that, if timely developed, would have cast serious doubt on propriety of arrest). Therefore, the District of Columbia met its burden of persuasion that it was immune from liability, and the trial court properly ruled that it was entitled to judgment on the claims of false arrest and imprisonment.[8] Because "absolute immunity defeats a suit at the outset," *Imbler v. Pachtman,* 424 U.S. 409, 419 n. 13, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976), "[w]henever possible, the question of absolute immunity should be determined at the outset of litigation," *District of Columbia v. Jones,* 919 A.2d 604, 610 (D.C.2007).

---

tion, evaluation of the detective's good faith and the reasonableness of his actions must depend on the information he received through the interpreters.

**8.** The false imprisonment claim would be treated separately if the police had continued to detain appellant after recognizing that they did not have sufficient grounds for arresting him. *See* 32 AM.JUR. 2d, *False Imprisonment* § 32 (2007) ("Unreasonable delay in releasing a person after he or she has a right to be released may constitute false imprisonment. However, there is no liability for prolonging detention until the officers become convinced of the truth of the detainee's claim." (footnote omitted)); *cf. Gerstein v. Pugh,* 420 U.S. 103, 113–14, 95 S.Ct. 854, 43 L.Ed.2d 54 (1975) ("[P]oliceman's on-the-scene assessment of probable cause provides legal justification for arresting a person suspected of crime, and *for a brief period of detention* to take the administrative steps incident to arrest." (emphasis added)); *Thompson v. Olson,* 798 F.2d 552, 556 (1st Cir.1986) ("On the other hand, having once determined that there is probable cause to arrest, an officer should not be required to reassess his probable cause conclusion at every turn, whether faced with the discovery of some new evidence or a suspect's self-exonerating explanation from the back of the squad car."). Since appellant was released as soon as the U.S. Attorney determined there was no probable cause to charge him, the false imprisonment and false arrest claims rise and fall together.

## B. Defamation

 Appellant's defamation claim likewise faces a governmental immunity defense. "[A]bsolute immunity [is] available when (1) the official acted within the outer perimeter of his official duties, and (2) the particular government function at issue was discretionary as opposed to ministerial." *Moss*, 580 A.2d at 1020 (internal quotation marks omitted); *cf. Saucier v. Katz*, 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001) (in the context of qualified immunity of a police officer, "[i]f no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries."). "When determining whether an act qualifies for absolute immunity, the court does not inquire into an official's motives." *Jones*, 919 A.2d at 610 (citing *Barr v. Matteo*, 360 U.S. 564, 575, 79 S.Ct. 1335, 3 L.Ed.2d 1434 (1959)).[9]

 For an act to come within the "outer perimeter" of official duties it need only be "related *more or less* to the general matters committed by law to [the officer's] control and supervision." *Barr*, 360 U.S. at 578, 79 S.Ct. 1335 (Black, J., concurring) (emphasis added). The MPD Officers were investigating a murder in the course of their official duties. The release of information that directly concerns the arrest of a suspect in a notorious murder on a university campus is clearly connected to those official duties.

The distinction between discretionary and ministerial actions by government officials is designed "to assure fearless, vigorous, and effective decision-making" by the police and to "determine whether society's concern to shield the particular government function at issue from the disruptive effects of civil litigation requires subordinating the vindication of private injuries otherwise compensable at law." *Moss*, 580 A.2d at 1020–21. As we explained in *Jones*:

> Adopting a test articulated in *District of Columbia v. Thompson*, 570 A.2d 277, 297 (D.C.1990), *vacated in relevant part on rehearing*, 593 A.2d 621, 624 (D.C. 1991), *Moss* lists four factors the court may use to inform its balancing: (1) the nature of the injury, (2) the availability of alternative remedies, (3) the ability of the courts to judge fault without unduly invading the executive's function, and (4) the importance of protecting particular kinds of acts. 580 A.2d at 1021. This list is not exclusive; a court may use other factors it deems relevant. *District of Columbia v. Simpkins*, 720 A.2d 894, 899 (D.C.1998); *Moss*, 580 A.2d at 1021 n. 21, 1022. "[T]he court must evaluate whether the contribution to effective government of the immunity urged would or would not outweigh the harm to the plaintiff." *Moss*, 580 A.2d at 1021. We have cautioned that "the scope of immunity should be no broader than necessary to ensure effective governance." *Id.*

*Jones*, 919 A.2d at 609.

Applying these factors, the trial court's assessment was that the nature of appellant's injury and the unavailability of other remedies weighed against immunity, but eventually determined that the actions were discretionary because second-guess-

---

9. In the related area of qualified immunity, the Supreme Court has counseled courts to grant summary judgment to end litigation when a factual inquiry at a full trial "could undermine the goal of qualified immunity to avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment.... If the law did not put the officer on notice that his conduct would be clearly unlawful, summary judgment based on qualified immunity is appropriate." *Saucier*, 533 U.S. at 202, 121 S.Ct. 2151 (citation and internal quotation marks omitted).

ing the judgments of police officials in conducting sensitive murder investigations would intrude unduly in the executive function. With respect to the nature of the injury—harm to appellant's reputation and the need to explain his arrest on future applications to school, work, etc.—we agree with the trial court, *but cf. Jones,* 919 A.2d at 609 (noting that non-physical injury cuts in favor of immunity); as to alternative remedies to address the injury to his reputation, the record in this case shows that appellant's release was immediately disclosed by MPD and reported in the news media. And the real murderer has been identified and convicted. Although these actions cleared appellant's name, they would not have completely compensated for the distress and disruption to a young man starting out in college. *See id.* The third and fourth factors, however, weigh heavily in favor of immunity. Moreover, as we have concluded that the arrest itself is shielded by official immunity, it follows as a matter of law that MPD's accurate publication of that fact—limited to essentials [10] and immediately corrected upon appellant's prompt release—similarly comes within official immune acts. Thus, the grant of summary judgment to the District on the defamation claim was proper in this case.

## C. Infliction of Emotional Distress

Appellant also raised claims of both intentional and negligent infliction of emotional distress based on Detective Cimiotti's conduct during his interrogation of appellant and the subsequent publication of appellant's arrest. We conclude that the trial court properly granted summary judgment as to both claims.

"To succeed on a claim of intentional infliction of emotional distress, a plaintiff must show (1) extreme and outrageous conduct on the part of the defendant which (2) intentionally or recklessly (3) causes the plaintiff severe emotional distress." *District of Columbia v. Thompson,* 570 A.2d 277, 289–90 (D.C.1990) (internal quotation marks omitted); *see also Carter v. Hahn,* 821 A.2d 890, 892–93 (D.C. 2003). Even if we assume (and we have no cause to doubt) that Detective Cimiotti's interrogation and arrest of appellant, his overnight detention, and his identification in the press as a murder suspect did, as a matter of fact, cause Minch severe emotional distress, the District of Columbia was nonetheless entitled to summary judgment because the undisputed facts failed to establish the essential element of "extreme and outrageous conduct." *Thompson,* 570 A.2d at 289–90.

The federal trial court in this jurisdiction considered a similar claim in a situation where the police had issued a press release implicating a person in a crime that he did not commit. The court found:

> It is undisputed that [MPD's] statement is incorrect. .... Nevertheless, not all misstatements are lies; not all false statements are fabrications. And here there is no evidence to suggest that [the police detective] made this mistake deliberately or in blatant disregard of what he actually knew, or indeed, that it was anything other than an honest mistake born of an incomplete investigation. Accordingly, plaintiff's intentional infliction claim cannot survive.

*Liser,* 254 F.Supp.2d at 106. For the same reasons, MPD's publication of appellant's arrest as a suspect in Plunkett's

---

**10.** The MPD release did not, for example, disclose the reason for Minch's altercation with Plunkett.

murder does not, as a matter of law, make out a claim of intentional infliction of emotional distress because MPD's actions—though mistaken—were not extreme and outrageous under the circumstances.

■ Appellant also claims that Detective Cimiotti's interrogation techniques were "outrageous," which we have defined as conduct that is "atrocious and utterly intolerable in a civilized community." *Waldon v. Covington,* 415 A.2d 1070, 1076 (D.C.1980). According to appellant, the detective threatened him to make a confession to the murder on pain that he would be imprisoned and people "would think all sorts of bad things" about him. In addition, Ms. Mather, an interpreter present at the interview, stated that Detective Cimiotti told Minch that he had witness statements that Minch had been with Plunkett at the time of the murder, that the web camera on Plunkett's computer was on, and that the police found bloody fingerprints all over the dorm room.

Appellant relies on *Drejza v. Vaccaro,* 650 A.2d 1308 (D.C.1994), a case in which there was evidence that a policeman belittled and harassed a woman who was trying to report herself to the officer as a victim of rape. *See id.* at 1308–9. Considering the relative status of the parties, we concluded that the officer's conduct—if proven at trial—would be outrageous because the officer "abused the authority of his office to ridicule, bully, humiliate, and insult her," and because Drejza, by "[b]eing a rape victim," suffered from a "peculiar sus-ceptibility to emotional distress" of this sort. *Id.* at 1314. None of the depositions or reports of the police interrogation in this case, on the other hand, show such abuse of authority or outrageous act, and Minch fails to allege that the police employed techniques that are not authorized police practices.[11] *See Davis v. United States,* 724 A.2d 1163, 1168 (D.C.1998) (police falsely told· defendant that his co-perpetrator had said defendant was carrying a particular weapon); *Contee v. United States,* 667 A.2d 103, 104 (D.C.1995) (police ran a fake lie-detector test on defendant); *Hawkins v. United States,* 461 A.2d 1025, 1027 (D.C.1983) (police falsely told defendant that "an investigation revealed that he was responsible"). While Minch's youth, inexperience, and deafness might have heightened his susceptibility to emotional distress in the charged atmosphere of a police murder investigation, in this case the evidence shows that MPD, by using two ASL interpreters, sought to address his particular situation, and otherwise afforded him breaks and offered basic amenities (food and access to the bathroom) during the interview.

■ The claim of negligent infliction of emotional distress also was properly dismissed because, even if we assume that the conduct of the murder investigation leading to Minch's arrest (including the interrogation) was not "thorough or professional," as the trial court found, appellant failed to allege a required element in his complaint (or to provide evidence in oppos-

---

11. Neither party raises the issues of whether immunity applies to a claim of intentional infliction of emotional distress, or of whether "outrageous" conduct in a custodial interrogation can only be conduct that also violates the Fourth Amendment. In the related context of a civil suit for excessive force, the Supreme Court ruled that "[i]f no constitutional right would have been violated were the allegations established," then the suit must be dismissed. *Saucier,* 533 U.S. at 201, 121 S.Ct. 2151. "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202–03 (dismissing civil suit for failure to show a clear Fourth Amendment violation). The same reasoning would appear to apply with equal force to the present case.

ing summary judgment) that he was "in the zone of physical danger and as a result feared for his . . . safety because of defendant's negligence." *Williams v. Baker*, 572 A.2d 1062, 1073 (D.C.1990). Appellant's claim that he suffered psychological injury is not, "in the absence of physical injury or impact," enough. *See Waldon v. Covington*, 415 A.2d 1070, 1076 (D.C. 1980).[12] Accordingly, the grant of summary judgment in favor of the District of Columbia is

*Affirmed.*

---

**12.** We do not overlook or dismiss that appellant was shaken and fearful during and following his interview with Detective Cimiotti; as the detective said at deposition, Minch "became nervous, shaking, covering his face. . . ." But although the arrest report indicated that appellant was "SUICIDAL," there was no other evidence supporting that appellant intended to harm himself, or would have been successful had he attempted to do so given the alert to jail officials on the report. Minch's testimony that he left Gallaudet and went back home to New Hampshire after he was arrested because he "did not feel safe" in the District was not supported by evidence of threats to his person.