*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

## DISTRICT OF COLUMBIA COURT OF APPEALS

### 20-CV-146

MOHAMMED KALAN, M.D., APPELLANT

V.

MEDSTAR-GEORGETOWN MEDICAL CENTER, INC., ET AL., APPELLEES.

Appeal from the Superior Court
of the District of Columbia
(CAB-4039-19)

(Hon. Robert R. Rigsby, Trial Judge)

(Argued April 27, 2021                    Decided July 1, 2021)

*M. Natalie McSherry*, with whom John A. Bourgeois and Geoffrey H. Genth were on the brief, for appellant.

*Brian L. Schwalb*, with whom Moxila A. Upadhyaya and David A. Levie were on the brief, for appellees.

Before EASTERLY, MCLEESE, DEAHL, *Associate Judges*.

EASTERLY, *Associate Judge*: Dr. Mohammed Kalan sued MedStar-Georgetown University Hospital (MGUH) in Superior Court after the hospital terminated his clinical privileges. The Superior Court granted MGUH's motion to dismiss under Superior Court Rule of Civil Procedure 12(b)(6) on the ground that

the hospital was immune from a suit for damages under the federal Health Care Quality Improvement Act (HCQIA) and from a suit for any type of relief under the District of Columbia's Health-Care Peer Review Amendment Act (HCPRAA) of 1992. Reviewing that ruling de novo and accepting the detailed allegations in Dr. Kalan's complaint as true as we must, we conclude that dismissal of Dr. Kalan's suit was unwarranted. Even under the HCQIA, which contains a rebuttable presumption that a health-care entity cannot be held liable for the actions of its professional review bodies, the fact-intensive assessment of whether the professional review body has satisfied the substantive and procedural standards that justify damages immunity under the statute is generally better addressed at later stages of litigation; and under the HCPRAA, which contains no such presumption, a ruling that a health-care entity is immune from suit is generally infeasible at the pleading stage. Thus, we vacate the trial court's decision and remand for further proceedings.

## I.     Facts and Procedural History

Dr. Kalan, an academic surgeon,[1] was granted clinical privileges at MGUH, allowing him to treat patients there, in 1999.  According to MGUH's bylaws, a physician must renew their clinical privileges every two years.[2]  Given that Dr. Kalan was permitted to practice at the hospital until 2017, it appears MGUH renewed his privileges multiple times.

According to Dr. Kalan's complaint, in 2016, the hospital's Surgical Practice Committee, a body that monitors the performance of surgeons, reviewed one case in which another doctor had raised concerns about whether Dr. Kalan adequately advised the patient (denominated "Patient 3") about the risks and benefits of different surgical procedures.  The Committee did not notify Dr. Kalan of its review or request his input about this case. The Committee ultimately decided that, going forward, Dr. Kalan would be required to refer this type of case "for review by a faculty member that has privileges to perform that particular operation" and that a

---

[1] Dr. Kalan does not define this term, but it appears to mean that he both treats patients and teaches medical students.

[2] For this proposition we rely on MGUH's bylaws, which the MGUH defendants attached to their memorandum of law in support of their motion to dismiss and which are included in the joint appendix submitted to this court.

"focus practice plan evaluation" would be put in place to evaluate Dr. Kalan's performance for the next six months. Dr. Kalan was apparently notified of this decision after the fact and requested additional information. The Committee did not respond to his request, and the focus practice plan evaluation was never implemented. Later in 2016, the Committee reviewed another one of Dr. Kalan's cases ("Patient 4"), believing that a bladder injury had occurred during surgery, when in fact "qualified experts" later determined that it was not possible to say when the injury occurred. Again, Dr. Kalan was not given an opportunity to present to the Committee or respond to its concerns; instead, at the culmination of this meeting, the leadership of the hospital (defendants Dr. Lisa Boyle and Dr. Michael Sachtleben) endorsed a plan to terminate Dr. Kalan's privileges in the upcoming renewal cycle.

Dr. Kalan applied to renew his clinical privileges in 2017. Two internal bodies responsible for reviewing such applications, the Credentials Committee and the Medical Executive Committee, recommended in turn that Dr. Kalan's privileges be terminated, based in part on patient care concerns from the two cases in 2016. Both committees based their decisions exclusively on oral reports from MGUH leadership (defendant Dr. Boyle and the head of the Medical Executive Committee, Dr. Cirrelda Cooper) and others who had no personal knowledge of Dr. Kalan's

patient care; neither committee reviewed any patient records or other documents. Several of the members of the Medical Executive Committee were direct competitors of Dr. Kalan. Dr. Kalan was not given notice of either Committee meeting or an opportunity to be heard.

Two days after the Medical Executive Committee meeting, the Quality and Safety Professional Affairs Committee (QSPAC) convened by phone to discuss the previous committees' recommendations not to renew Dr. Kalan's credentials. Again, Dr. Kalan was not given notice of the meeting or an opportunity to be heard. As with the Credentials Committee and the Medical Executive Committee meetings, Dr. Boyle "commandeered" the QSPAC meeting. The QSPAC voted not to renew Dr. Kalan's privileges based in part on the false representation that there had been concerns about the care he provided since 2005. A letter from the QSPAC, dated May 30, 2017, was emailed to Dr. Kalan on June 8, 2017, informing him that his privileges were being terminated by virtue of not being renewed on June 9, 2017. Also on June 8, 2017, defendant Dr. Boyle telephoned a patient of Dr. Kalan's who was scheduled for surgery the next day and informed the patient that Dr. Kalan no longer had privileges at MGUH and could not perform the procedure.

Dr. Kalan appealed the denial of his application to MGUH's Professional Review Committee (PRC). The PRC held a hearing on January 19, 2018. Dr. Kalan objected to the composition of the PRC on the grounds that some members were his economic competitors or harbored personal bias against him. Although the PRC determined that Dr. Kalan had not breached the standard of care for Patient 3, it upheld the termination of his privileges, relying on allegations not considered by the QSPAC, "some of which were unsubstantiated or hearsay" and at least one of which was made anonymously. According to Dr. Kalan, the PRC proceeding was a "trial by ambush," and the reliance on allegations not previously considered was an implicit admission that the earlier allegations did not support termination of his privileges.

A Special Committee of MGUH's Board of Directors approved the PRC's decision. Thereafter, MGUH notified the National Practitioner Data Bank that the hospital had revoked Dr. Kalan's privileges. The notice explained that the revocation was due to "failure to provide medically reasonable and/or necessary items or services"; "patient neglect"; and "substandard or inadequate care."

Dr. Kalan filed a complaint in Superior Court, naming MGUH and a number of its officers as defendants in their personal capacity and as agents of MGUH ("the

MGUH defendants") and asserting various tort and contract claims. In addition to damages, he requested injunctive relief in the form of an order directing the hospital to reinstate his clinical privileges. The MGUH defendants did not answer the complaint and instead filed a motion to dismiss under Rule 12(b)(6). The MGUH defendants argued that (1) Dr. Kalan could sue the hospital only for failing to follow its bylaws, (2) he had failed to state viable claims against them, and (3) they were immune from suit under federal and D.C. law. The MGUH defendants requested a hearing on their motion.

In his opposition, Dr. Kalan argued that his "specific factual allegations, the truth of which is accepted for purposes of Defendants' Motion, bar Defendants from persuasively arguing, as a matter of law at the pleading stage, that Defendants are statutorily immune from Dr. Kalan's claims." Dr. Kalan also argued that he had pled viable claims against the MGUH defendants but alternatively asked for leave to amend his complaint. Lastly, Dr. Kalan joined the MGUH defendants in requesting that the trial court hold a hearing on the MGUH defendants' motion.

In their reply, the MGUH defendants renewed their arguments that Dr. Kalan's complaint should be dismissed, this time asserting dismissal should be with

prejudice. Although they did not renew their request for a hearing, they did not oppose Dr. Kalan's request.

Without holding a hearing, the trial court granted the MGUH defendants' motion and dismissed Dr. Kalan's complaint. Relying on this court's decision in *Balkissoon v. Capitol Hill Hosp.*, 558 A.2d 304 (D.C. 1989), the court first determined its review of this case was "largely limited to reviewing whether Defendants followed the procedures in the hospital's bylaws when they decided not to renew Plaintiff's admitting privileges."[3] With this foundation, the court concluded that it lacked the authority to grant Dr. Kalan the injunctive relief he requested but that its "limited review" did not prevent Dr. Kalan from bringing the tort and contract claims pled in his complaint. The court determined that MGUH was immune from a suit for damages, however, because the facts alleged in Dr.

---

[3] The trial court framed *Balkissoon* as a decision that limited a doctor-plaintiff's claims. *But see* 558 A.2d at 307, 310 (explaining that where the plaintiff had "claimed that the Hospital had wrongly denied him staff privileges and substantive and procedural due process by denying his application for reappointment without following the procedures in its bylaws," the trial court had erred in granting the defendant's motion for summary judgment, because even though the plaintiff "may not have asserted facts from which we could conclude that the decision of the Hospital was 'state action,' such as to require that the Hospital afford appellant due process in the constitutional sense," the hospital was still obligated to afford "*at least* all the process and protections encompassed in its bylaws" (emphasis added)).

Kalan's complaint were insufficient to rebut the presumption that the professional review action[4] in his case satisfied the requirements of 42 U.S.C. § 11112 and because MGUH had complied with its bylaws' internal review procedures when terminating Dr. Kalan's privileges. Lastly, the court determined that the MGUH defendants were also immune from suit under what the trial court understood to be the "substantially similar" D.C. Health-Care Peer Review Amendment Act of 1992, D.C. Code § 44-801 et seq. (2012 Repl.). This appeal followed.

## II.    The Federal and Local Peer Review Immunity Statutes

"Peer review, the process by which physicians and hospitals evaluate and discipline staff doctors, has become an integral component of the health care system in the United States." *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1321 (11th Cir. 1994). In 1986, Congress passed the Health Care Quality Improvement Act to promote "effective professional peer review," 42 U.S.C. § 11101(3), and to facilitate "interstate monitoring of incompetent physicians," *Austin v. McNamara*, 979 F.2d 728, 733 (9th Cir. 1992). Recognizing that "[t]he threat of private money damage liability . . . unreasonably discourages physicians

---

[4] The court referenced a number of MGUH committees, but it did not identify which committee action (or actions) it understood to be protected under the HCQIA.

from participating in effective professional peer review," 42 U.S.C. § 11101(4), the HCQIA provides a countervailing incentive in the form of damages immunity when "professional review actions" meet certain substantive and procedural standards. The statute is "designed to facilitate the frank exchange of information among professionals conducting peer review inquiries without the fear of reprisals in civil lawsuits" for damages, but it also "attempts to balance the chilling effect of litigation on peer review with concerns for protecting physicians improperly subjected to disciplinary action." *Bryan*, 33 F.3d at 1322; *see also id.* n.3 (explaining Congress restricted the immunity provision after concerns were raised that it "might be abused and serve as a shield for anti-competitive economic actions under the guise of quality controls" (internal citation omitted)). As an indication of the difficulty of this enterprise, "the statutory scheme is somewhat convoluted." *Id*. at 1322.

The HCQIA defines "professional review action" as

[A]n action or recommendation of a professional review body which is taken or made in the conduct of professional review activity, which is based on the competence or professional conduct of an individual physician (which conduct affects or could affect adversely the health or welfare of a patient or patients), and which affects (or may affect) adversely the clinical privileges, or membership in a professional society, of the physician.

42 U.S.C. § 11151(9). The HCQIA defines "professional review body" in relevant part as "any committee of a health care entity [such as a hospital[5]] which conducts professional review activity [such as 'determin[ing] whether [a] physician may have clinical privileges' with a hospital[6]], and includes any committee of the medical staff of such an entity when assisting the governing body in a professional review activity." 42 U.S.C. § 11151(11).

Employing these definitions, the immunity provision of the HCQIA, 42 U.S.C. § 11111(a)(1), provides that a professional review body or, inter alia, "any person acting as a member or staff to the body . . . [or] any person who participates with or assists the body with respect to the action[] shall not be liable in damages" under federal or state law for a professional review action if that action is

> taken[] (1) in the reasonable belief that the action was in the furtherance of quality health care, (2) after a reasonable effort to obtain the facts of the matter, (3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and (4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

---

[5] 42 U.S.C. § 11151(4)(A)(i), (5) (defining "health-care entity" and "hospital").

[6] 42 U.S.C. § 11151(10)(A).

42 U.S.C. § 11112(a)(1)–(4). "A health care entity is deemed to have met the adequate notice and hearing requirement of subsection (a)(3) with respect to a physician if [certain] conditions are met (or are waived voluntarily by the physician)," such as notice of a proposed action and reasons for the action, notice of a hearing (including a list of testifying witnesses), the right to representation by counsel, and the right to cross-examine witnesses. 42 U.S.C. § 11112(b). But the failure to provide all of the process outlined in subsection (b) is not per se a failure to satisfy (a)(3). *Id.*

The HCQIA creates a presumption that "[a] professional review action [has] met the . . . standards" set forth in 42 U.S.C. § 11112(a)(1)–(4) and places the burden on a plaintiff to rebut that presumption "by a preponderance of the evidence." 42 U.S.C. § 11112(a); *see also Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 879 (3d Cir. 1995). Because a professional review action must "meet[] all the standards specified in section 11112(a)" in order for the professional review body to be immune from damages under the statute, 42 U.S.C. § 11111(a)(1), "[t]o defeat immunity, a plaintiff need only show that any one of these four standards was not met," *Peper v. St. Mary's Hosp. & Med. Ctr.*, 207 P.3d 881, 887 (Colo. App. 2008) (ellipsis and internal quotation marks omitted).

Six years after Congress enacted the HCQIA, the D.C. Council enacted the D.C. Health-Care Peer Review Amendment Act of 1992, D.C. Code § 44-801 et seq. The HCPRAA provides that

> [n]o peer review body or member thereof, or person acting as its staff, or who participates with or assists such a body or member, operating in the District of Columbia shall be liable to any person for damages or equitable relief by reason of conducting or taking peer review if the peer review was within the scope of the functions of the peer review body and if the peer review body or the member acted in the reasonable belief that the peer review was warranted by the facts known after reasonable effort to obtain the facts of the matter.

D.C. Code § 44-803. "Peer review body" is defined in relevant part as "a committee . . . of a health-care facility or agency . . . that engages in peer review," D.C. Code § 44-801(6), such as the "renewal [or] denial . . . of clinical privileges to provide health-care services at a health-care facility or agency," D.C. Code § 44-801(5)(B). And "health-care facility or agency" is defined as "a facility, agency, or other organizational entity as defined in [D.C Code] § 44-501," which includes a hospital. D.C. Code § 44-801(2); D.C. Code § 44-501(a)(9).

This court has not previously published a decision either interpreting the HCQIA or analyzing immunity from suit for peer review actions under the HCPRAA.

### III.    Analysis

The trial court dismissed Dr. Kalan's complaint at the pleading stage based on its determination that the MGUH defendants were immune from suit for damages under the HCQIA and from suit for any type of relief under the HCPRAA.  The trial court had already rejected Dr. Kalan's request for injunctive relief on other grounds; Dr. Kalan has not challenged that ruling on appeal.  Thus the question before us is whether the trial court correctly determined that MGUH defendants enjoyed damages immunity under the federal and District of Columbia statutes.  We review this legal ruling de novo.  *Poola v. Howard Univ.*, 147 A.3d 267, 276 (D.C. 2016) ("This court reviews de novo a dismissal under Super. Ct. Civ. R. 12(b)(6) for failure to state a claim on which relief can be granted." (emphasis omitted)); *see also Peper*, 207 P.3d at 888 (holding that HCQIA immunity is a "de novo legal question" (internal quotation marks omitted)).  In so doing, we examine the complaint in the same manner as the trial court was obliged to examine it, accepting the factual allegations as true and drawing all reasonable inferences in favor of Dr. Kalan as the plaintiff.  *Poola,* 147 A.3d at 276.  For the reasons we detail below, we conclude that the trial court did not have a basis, at least at this point in the proceedings, to

determine that the MGUH defendants were entitled to damages immunity under either federal or local law.[7]

## A. Immunity under the HCQIA

We begin our analysis of the trial court's 12(b)(6) ruling regarding HCQIA immunity by highlighting that the statute does not confer "a right to avoid standing trial" or even a right not to be sued. *Bryan*, 33 F.3d at 1331 n.3 (citing *Decker v. IHC Hosps., Inc.*, 982 F.2d 433, 436 (10th Cir. 1992); *Manion v. Evans*, 986 F.2d 1036, 1042 (6th Cir. 1993)).  The HCQIA by its plain language protects healthcare entities from being held "liable in damages."  42 U.S.C. § 11111(a).  The statute confers this protection by establishing a presumption that professional review actions taken by professional review bodies meet the substantive and procedural standards set forth in 42 U.S.C. § 11112(a)(1)–(4).  But the statute also permits that presumption to be rebutted by a preponderance of the evidence.

---

[7] We have not been asked to separately determine if the trial court abused its discretion under Superior Court Rule of Civil Procedure 12-I(h) when it ruled on the MGUH defendants' motion to dismiss without holding a hearing as both parties had requested.  But given the complexity of the immunity question, *see Bryan*, 33 F.3d at 1322, and the lack of guiding case law from this court, *see supra* Section II, we have little doubt that the trial court would have been better served by holding a hearing before ruling on the MGUH defendants' motion to dismiss.

At the 12(b)(6) stage, a plaintiff is generally entitled to rely on his complaint and need only allege "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *accord Potomac Dev. Corp. v. District of Columbia*, 28 A.3d 531, 544 (D.C. 2011) ("When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). Further, the requirement that a plaintiff rebut the presumption of damages immunity under the HCQIA by showing that a hospital has failed to satisfy one or more of the four standards set forth in § 11112(a) suggests that a trial court should conduct a fact-intensive assessment of the "reasonable[ness]" of a hospital's actions and the "adequa[cy]" of its procedures "under the circumstances," 42 U.S.C. § 11112 (a)(1)–(4), which likely will require discovery and development of the record. Courts have thus concluded that evaluating whether a health-care entity is entitled to immunity under the HCQIA is a task generally better suited for resolution at the summary judgment stage—*see, e.g.*, *Brader*, 64 F.3d at 879 (explaining that the provision "[u]nder the HCQIA, [where] professional review actions are presumed to meet the required standard unless that presumption is rebutted by a preponderance of the evidence . . . implies some opportunity to discover relevant evidence" (internal quotation marks and citations omitted)); *Zamanian v. Jefferson Par. Hosp. Serv. Dist. No.2*, 2017 WL

3480993, at *5 (E.D. La. Aug. 14, 2017) (declining to grant motion to dismiss where the plaintiff alleged detailed facts about only one of the immunity factors related to adequate notice and process and providing "[p]laintiff with an opportunity to conduct further discovery given that this matter is still in the early stages of litigation and immunity is often invoked on a motion for summary judgment, not a motion to dismiss" (internal quotation marks omitted)), *aff'd*, 747 F. App'x 982 (5th Cir. 2019)—and may even be delayed until after trial, *see, e.g.*, *Bryan*, 33 F.3d at 1332 & n.25 (noting that the American Medical Association, appearing as amicus, had taken the position that "[u]nder the HCQIA, the vast majority of lawsuits challenging peer review proceedings should be dismissed at the summary judgment stage" and concluding that "although immunity may be determined at the summary judgment stage, resolution of that issue may be deferred until or after trial if the standards of [Federal Rule of Civil Procedure] 56 cannot be satisfied").

We endorse this approach and conclude that where a plaintiff has alleged sufficient facts in his complaint to call into question whether standards for professional review actions set forth in the HCQIA were satisfied, the trial court should defer consideration of immunity to the evidentiary stage of the case.[8]  We

---

[8] We recognize that HCQIA immunity "may be resolved whenever the record in a particular case becomes sufficiently developed," *Bryan*, 33 F.3d at 1332, and

turn to examine whether Dr. Kalan alleged sufficient facts in his complaint to survive a motion to dismiss on HCQIA immunity grounds.

In his complaint, Dr. Kalan discussed the actions of a number of advisory and decisionmaking committees within MGUH. The trial court never identified which MGUH committees it understood to be "professional review bodies" engaged in protected "professional review actions" under the HCQIA. It appeared to assume that all of the MGUH committees so qualified. Because these committees all appear to take "an action or [make a] recommendation . . . based on the competence . . . of an individual physician and which affects (or may affect) adversely the clinical privileges . . . of the physician," 42 U.S.C. § 11151(9), we proceed on the same assumption.

Examining Dr. Kalan's complaint, we conclude he pleaded sufficient facts to demonstrate at least that these committees did not meet the HCQIA standards set forth in 42 U.S.C. § 11112(a)(2) (requiring "a reasonable effort to obtain the facts of

---

we erect no bar to dismissal where a defendant has failed to allege sufficient facts in his complaint to indicate that he is capable of rebutting the presumption of immunity. *Id*. (acknowledging "Congress clearly intended HCQIA to permit defendants in suits arising out of peer review disciplinary decisions to file motions to resolve the issues concerning immunity from monetary liability as early as possible in the litigation process").

the matter") and (3) (requiring "adequate notice and hearing procedures"). These adequately pled deficiencies alone precluded the trial court from granting the MGUH defendants immunity at this juncture. *See, e.g.*, *Brader*, 64 F.3d at 879 (concluding that if "extensive allegations" in the plaintiff's complaint regarding improprieties in the peer review process were accepted as true, then "defendants would not be entitled to HCQIA immunity," and thus declining to affirm dismissal on this ground).[9]

### 1. 42 U.S.C. § 11112(a)(2)

The trial court determined that "though" Dr. Kalan had "summarily allege[d]" that MGUH's professional review committees did not make "reasonable efforts to obtain the facts of the matter" as required under section 11112(a)(2), "the facts as presented" in his complaint did not support this claim. We cannot agree. Dr. Kalan detailed the various stages of the peer review process in his complaint and asserted that the first two committees in the credential renewal process—the Credentials

---

[9] Dr. Kalan argues that he adequately pled that none of the standards set forth in 42 U.S.C. § 11112(a)(1)–(4) were satisfied. But because we determine he carried his burden to rebut the presumption of immunity by making well-pleaded allegations that two standards were not met, we need not address the remainder.

Committee and the Medical Executive Committee—considered only oral hearsay reports from MGUH leadership and did not review any patient records or review any other evidence from anyone with personal knowledge.[10]  Dr. Kalan further alleged that the QSPAC, the third committee in the sequence and the actual decisionmaker that denied renewal of his privileges, (1) convened only two days after the Medical Executive Committee meeting and (2) was, like the prior two committee meetings, "commandeered" by Dr. Boyle (who had no personal knowledge and who harbored bias against Dr. Kalan), thus supporting an inference that no additional investigation was done before a predetermined decision was reached.  Lastly, according to Dr. Kalan, none of these committees asked him for his input, which might be considered part of a reasonable investigation.

The MGUH defendants argue in their brief to this court that the investigation by the various committees was reasonable and that "each action . . . was taken only after [Dr. Kalan's] cases and level of care were analyzed."  As support for this

_____

[10] The trial court noted that "there is nothing in the record before the Court that suggests the Credentials Committee did not review Plaintiff's extensive application" for renewal of his privileges.  But if we accept Dr. Kalan's assertions as true—in particular his assertions that he did not have notice that the committees were meeting and discussing the quality of his care of specific patients—then his application to renew his privileges would have no reason to provide facts related to those patients.

assertion, they reference passages in Dr. Kalan's complaint stating that the quality of his care "was discussed" in the various committee meetings, but they ignore that Dr. Kalan sufficiently alleged that these discussions were not based on adequate inquiry and information. The MGUH defendants also argue that "the decision to not renew [Dr. Kalan's] privileges did not become final until after the Hospital concluded its full review process," which included the PRC hearing "where Plaintiff was represented by counsel and was given an opportunity to present evidence and arguments." The MGUH defendants provide no support for the proposition that where multiple professional review bodies are involved, some inquiry by the last in the line will compensate for inadequate efforts to obtain facts before the decision to terminate privileges was made and took effect. And the plain text of the statute contradicts it. *See* 42 U.S.C. § 11112(a)(2) (requiring that, to be covered by the HCQIA, "a professional review action must be taken . . . in the reasonable belief that it is in the furtherance of quality health care . . . *after* a reasonable effort to obtain the facts of the matter" (emphasis added)); 42 U.S.C. § 11151(9) (defining "professional review action" in the singular as "an action or recommendation of a professional review body . . . ."). In any event, their argument confuses the obligation of a professional review body to undertake reasonable inquiry under 42 U.S.C. § 11112(a)(2) with the obligation to provide adequate notice and hearing procedures under 42 U.S.C. § 11112(a)(3).

## 2. 42 U.S.C. § 11112(a)(3)

Even as the trial court acknowledged that Dr. Kalan had alleged that "he was not permitted to present testimony or evidence" at the meetings of the Credentials Committee, Medical Executive Committee, or the QSPAC, the court determined that "there was adequate notice and hearing procedure." The court reasoned that (1) MGUH's bylaws do not allow for a physician to be given notice or an opportunity to be heard at these committee meetings, and (2) Dr. Kalan was given notice and an opportunity to be heard before the PRC.[11] Neither of these rationales withstands scrutiny.

First, as the trial court effectively acknowledged, Dr. Kalan plausibly and nonconclusorily alleged in his complaint that MGUH terminated his privileges without "adequate" or "fair" notice or hearing procedures. 42 U.S.C. § 11112(a)(3). Dr. Kalan alleged that (1) he had no knowledge of the proceedings before the Credentials Committee, the Medical Executive Committee, or the QSPAC at the

---

[11] The trial court also determined that Dr. Kalan "provided no facts" to support his allegations that the PRC was compromised by conflicts of interest. In his brief to this court, Dr. Kalan appears to only raise these alleged conflicts as evidence that the MGUH defendants failed to follow MGUH's bylaws, and not in relation to his challenge to the trial court's immunity ruling under the HCQIA. Accordingly, we do not address this part of the court's analysis.

time they were taking place; (2) the first time he received notice that a decision had been made (by the QSPAC) not to renew his privileges was on June 8, the day before his privileges were terminated on June 9; and (3) the hospital notified one of his patients on June 8 that Dr. Kalan would be unable to perform a scheduled surgery the following day. The fact that MGUH's bylaws did not require that Dr. Kalan be given notice of and an opportunity to be heard at any of the committee proceedings that preceded his termination is beside the point. The HCQIA does not confer immunity on health-care entities who conform their peer review processes to their bylaws; it confers immunity on health care entities if the particular professional review action at issue was taken in accordance with certain standards. *Poliner v. Tex. Health Sys.*, 537 F.3d 368, 380 (5th Cir. 2008) ("HCQIA immunity is not coextensive with compliance with an individual hospital's bylaws. Rather, the statute imposes a uniform set of national standards."). Just as "failure to comply with hospital bylaws does not defeat a peer reviewer's right to HCQIA immunity from damages," *id.* at 381, MGUH's professed fidelity to its bylaws in determining whether to renew Dr. Kalan's privileges does not insulate the MGUH defendants from liability for HCQIA purposes.[12]

---

[12] Citing our decision in *Balkissoon*, Dr. Kalan argues that the MGUH defendants violated the hospital's bylaws and acted arbitrarily and capriciously in deciding not to renew his privileges. Because these arguments go to the merits of

Second, it is hardly dispositive of the immunity inquiry that Dr. Kalan was given a PRC hearing more than six months after his privileges were terminated. The HCQIA peer review standards expressly contemplate a hearing before any professional review action—broadly defined to include both "action[s]" and "recommendation[s]," 42 U.S.C. § 11151(9)—is taken.[13]  *See* 42 U.S.C. § 11112(a)(3) ("[A] professional review action must be taken . . . *after* adequate notice and hearing procedures are afforded . . . ." (emphasis added)).  *See Brandner v. Providence Health & Servs.–Wash.*, 394 P.3d 581, 595–96 (Alaska 2017) (determining that even though a hospital provided physician a post-termination hearing, hospital's "failure to give [physician] the slightest opportunity to be heard *prior* to terminating his privileges—as required by § 11112(a)(3)—preclude[d] HCQIA immunity" (emphasis added)).

---

his claims and not to whether the MGUH defendants enjoyed damages immunity, we do not address them here.

[13] The MGUH defendants appear to urge us to conclude that the pre-termination process—the meetings of the Credentials Committee, the Medical Executive Committee, and the QSPAC—which were conducted without Dr. Kalan's knowledge, in conjunction with the post-termination process in which he participated, was covered by the safe harbor "fair . . . under the circumstances" language of 42 U.S.C. § 11112(a)(3). As discussed above, we disagree that distinct professional review actions can be evaluated under the HCQIA as an amalgamated mass as the MGUH defendants propose. *See supra* Section III.A.1. But even if the statute permitted it, the MGUH defendants' argument would be impossible to evaluate without more factual development.

For these reasons, we conclude that the trial court erred in determining that Dr. Kalan's complaint could be dismissed because the MGUH defendants were entitled to damages immunity under the HCQIA. Dr. Kalan alleged sufficient facts in his complaint to contest that the standards set forth in the HCQIA were satisfied in the professional review actions related to the termination of his clinical privileges; thus he indicated that, if his allegations are substantiated at the evidentiary stage, he could rebut the presumption that the MGUH defendants were immune from a suit for damages. Whether in fact he proves able to do so is a question to be resolved at a later time.

## B. Immunity under the HCPRAA

The trial court found that MGUH was also immune under D.C. Code § 44-803, observing that "[t]he requirements for immunity under [the District] statute are substantially similar to those set forth under 42 U.S.C. § 11112." The plain text of these provisions are quite different, however. *See supra* Section II. In particular, the HCPRAA lacks one critical feature of the HCQIA: the HCPRAA contains no rebuttable presumption that the procedural standards for peer review have been met and immunity is warranted. Without such a presumption, we discern no basis for a determination at the pleading stage that the MGUH defendants were immune from

a suit for damages under the HCPRAA; instead, the MGUH defendants must plead and prove their immunity under the statute as a defense.  *Cf. Bryan*, 33 F.3d at 1333 (explaining that "the presumption language in [the] HCQIA means that the *plaintiff* bears the burden of proving that the peer review process was *not* reasonable"); *Minch v. District of Columbia,* 952 A.2d 929, 936–37 (D.C. 2008) (observing that, in the context of absolute official immunity, "the burden of establishing that the official function in question merits absolute immunity rests on the defendant official" (internal quotation marks omitted)).

*            *            *

For the foregoing reasons we reverse and remand for further proceedings consistent with this opinion.

*So ordered*.