Eric Anthony PEPER, MD,
Plaintiff–Appellant,

v.

ST. MARY'S HOSPITAL AND MEDICAL CENTER, a Colorado nonprofit corporation; Frances Raley, MD; John C. Beeson, MD; and Robert Ladenburger, Defendants–Appellees.

No. 07CA2491.

Colorado Court of Appeals,
Div. II.

Dec. 11, 2008.

Robinson Waters & O'Dorisio, P.C., Anthony L. Leffert, Denver, Colorado, for Plaintiff–Appellant.

McConnell, Siderius, Fleischner, Houghtaling & Craigmile, LLC, Linda L. Siderius, Troy R. Rackham, Robert W. Steinmetz, Denver, Colorado, for Defendants–Appellees.

Opinion by Judge CONNELLY.

This appeal raises issues under the Health Care Quality Improvement Act of 1986 (HCQIA), 42 U.S.C. §§ 11101–11152. Plaintiff, Eric Anthony Peper, M.D. (Dr. Peper), sued defendants, St. Mary's Hospital and Medical Center (St. Mary's) and three of its officers, for revoking his hospital privileges. Another division of this court previously issued an unpublished opinion reversing summary judgment for defendants. On remand, the district court again granted summary judgment. Again we reverse. Defendants are not entitled to HCQIA immunity because Dr. Peper was denied notice and a hearing ("statutory due process") prior to the revocation, and he never waived his right to statutory due process.

## I. Background

Dr. Peper is a cardiothoracic surgeon. St. Mary's is a hospital in Grand Junction, Colorado. The individual defendants who signed the letter revoking Dr. Peper's privileges are

Frances Raley, M.D., as Chairman of St. Mary's Credentials Committee; John C. Beeson, M.D., as St. Mary's Vice President of Medical Affairs; and Robert Ladenburger, as St. Mary's President/CEO.

In spring 2002, Dr. Peper applied for and was granted medical staff privileges at St. Mary's. The hospital's letter stated the "appointment is to the Provisional Active Staff and to the Surgery Department for 2002." Then, in a December 2002 letter, St. Mary's congratulated Dr. Peper on his "reappointment" to the medical staff through December 2004. The letter stated this reappointment was to the "Prov Active Medical Staff" and was subject to the terms of the initial appointment and to hospital and medical staff bylaws.

In December 2002, without informing Dr. Peper, St. Mary's decided to review nineteen of his cardiothoracic cases (out of eighty-four procedures Dr. Peper had performed at St. Mary's). Dr. Peper alleges this decision was made after he told the hospital's president he planned to establish a competing medical practice.

St. Mary's submitted "charts" of the nineteen cases to an external reviewer. After reviewing those charts, the reviewer described an apparent "pattern of prolonged cross clamp and cardiopulmonary bypass times, and an excessive amount of blood usages," suggesting "there may be a problem with surgical technique and/or judgment." The reviewer's report also noted several cases of "misadventure," including "patients who were questionable candidates for mitral valve repair who underwent excessively long procedures" and "three patients who died." It stated, "Many of the complications noted were ones that any good cardiothoracic surgeon will encounter at one time or another," but there would be "cause for concern" in a data pool consisting of only one hundred total procedures at the hospital.

The external reviewer requested films on five of the patients for further review. St. Mary's did not provide this additional information to the reviewer.

On February 13, 2003, without prior notice, St. Mary's revoked Dr. Peper's privileges and staff membership "effective immediately." The letter notified Dr. Peper of the already-concluded review process and stated the external reviewer's "in-depth analysis demonstrated a pattern of consistently excessive cross-clamp times as well as several cases of care falling below generally accepted standards of practice." It added that St. Mary's credentials committee had "carefully reviewed these reports, discussed the findings, and found them to have merit."

The February 13 letter stated the signatories' "review of the Bylaws indicate [sic] that provisional privileges, when revoked, are not afforded a hearing or appeal [sic]." It informed Dr. Peper that the revocation would be reported to the National Practitioner Data Bank and the Colorado Board of Medical Examiners.

In August 2004, Dr. Peper brought a federal lawsuit and filed an administrative appeal to the state Committee on Anticompetitive Conduct (CAC). Both were dismissed. The court dismissed Dr. Peper's federal constitutional challenge after concluding St. Mary's was not a state actor, and it dismissed pendent state claims without prejudice. The CAC dismissed Dr. Peper's administrative challenge as untimely. Dr. Peper did not appeal either dismissal.

In September 2004, Dr. Peper filed this state lawsuit. His complaint, as amended, seeks monetary damages based on eight claims sounding in contract and tort. The district court dismissed the complaint, concluding defendants were entitled to immunity from damages. A division of this court reversed. *Peper v. St. Mary's Hospital and Medical Center*, 2006 WL 2024109 (Colo.App. No. 05CA1099, July 20, 2006) (not published pursuant to C.A.R. 35(f) ) (*Peper I* ).

*Peper I* construed the dismissal as a summary judgment because both sides had attached materials outside the pleadings. The majority concluded three of the four HCQIA immunity prerequisites were met: the first because defendants acted in the reasonable belief their action was in the furtherance of quality health care; the second because they acted after a reasonable effort to obtain the facts; and the fourth because they acted in the reasonable belief the action was warrant-

ed by the known facts. Peper I, at 5–11, 16–17 (discussing 42 U.S.C. §§ 11112(a)(1), (2) & (4) ); but see id. at 22–29 (Roy, J., concurring in part and dissenting in part) (disagreeing that second requirement was met).

Peper I reversed based on the third requirement for immunity, involving adequate notice and hearing procedures. See 42 U.S.C. § 11112(a)(3). Defendants relied on a HCQIA provision deeming this requirement to be met where the statutory procedures were "waived voluntarily by the physician," id. § 11112(b). The waiver, according to defendants, occurred when Dr. Peper applied for provisional status and agreed to be bound by medical staff bylaws that did not give rise to hearing and appeal rights for provisional staff.

The division unanimously held this third requirement had not been satisfied based on the then-existing record. It noted "a dearth of authority interpreting waiver under the HCQIA," and referenced "the general principle that waivers of statutory rights are disfavored." Peper I, at 12, 15 (citation omitted). It ultimately concluded "the record [was] not sufficiently developed to ascertain [Dr. Peper's] hearing rights" under the bylaws. Id. at 12. It cited an "apparent conflict" between the medical staff and the hospital bylaws regarding whether provisional staff members had hearing rights, and wrote that any bylaw ambiguity "would have to be resolved against the hospital, as the drafter." Id. at 14–15.

Peper I held "the requirements of § 11112(a)(3) were not adequately established to permit summary judgment on the basis of HCQIA immunity at this stage of the proceedings" and reversed as to this third factor but otherwise affirmed. Peper I, at 15. It "remanded for further proceedings consistent with this opinion, which may include a renewed summary judgment motion by defendants upon further record development concerning the possible bylaw conflict." Id. at 20.

The district court granted summary judgment on remand. It accepted defendants' arguments that: "[u]nder the terms of the Medical Staff Bylaws in effect at the time, provisional appointees clearly and unambigu-ously were not entitled to a hearing or appeal in the event of an adverse action against them during the provisional period"; and "[b]y accepting a provisional appointment, [Dr. Peper] thereby waived any right to a hearing on the action taken against him while he was still in the provisional period."

The court concluded "the purported [bylaws] conflict that concerned the court of appeals" no longer existed. It explained the undisputed facts developed on remand showed the conflicting provisions cited in the first appeal had not actually been in effect during the relevant time period.

Finding no bylaws conflict, the court defined the relevant issue as "whether [Dr. Peper's] express agreement to abide by the Hospital Bylaws and Medical Staff Bylaws constituted a voluntary waiver of the conditions placed upon St. Mary's notice and hearing procedures by 42 U.S.C. § 11112(b)." It answered this issue affirmatively, holding defendants entitled to HCQIA immunity.

## II. Discussion

The HCQIA provides immunity if four statutory standards, including the third one requiring due process, are met. Because Dr. Peper never received any notice or hearing, we must decide whether he waived statutory due process rights when he applied for provisional hospital privileges. Dr. Peper argues his application was legally insufficient to waive his statutory rights and contends there remain bylaw conflicts that preclude summary judgment. Defendants disagree and also argue there is no subject matter jurisdiction under Colorado law because Dr. Peper failed to exhaust state administrative remedies.

We first hold there is subject matter jurisdiction over this lawsuit. On the merits, we hold defendants are not entitled to HCQIA immunity because any agreement to be bound by hospital bylaws was legally insufficient to waive statutory due process rights under the third HCQIA standard. This holding obviates the need to consider Dr. Peper's arguments regarding bylaw conflicts or to consider his arguments that new evi-

dence demonstrates the other three HCQIA standards were not met.

### A. Subject Matter Jurisdiction Under Colorado Law

The prior division held that Dr. Peper, by not timely appealing to the state CAC, had failed to exhaust administrative remedies under the Colorado Professional Review Act (CPRA), §§ 12–36.5–101 to –203, C.R.S.2008. While it concluded that equitable relief was therefore precluded, no one suggested this failure to exhaust also precluded damages claims. Nonetheless, because defendants now argue there is no subject matter jurisdiction, we must decide the issue. *See Stone's Farm Supply, Inc. v. Deacon,* 805 P.2d 1109, 1112–13 (Colo.1991).

The CPRA was enacted shortly after, and is designed to complement, the federal HCQIA. *See North Colorado Medical Center, Inc. v. Nicholas,* 27 P.3d 828, 840–41 (Colo.2001). Two subsections of section 12–36.5–106, addressing challenges to "final action[s]" adversely affecting privileges or memberships, are relevant here. Subsection (7) provides a physician "who believes that such action resulted from unreasonable anticompetitive conduct shall have, as his sole and exclusive remedy, direct review" by the CAC; this CAC review "shall be limited to the sole issue of whether such final board action resulted from unreasonable anticompetitive conduct"; and "[f]ailure to exhaust this administrative remedy before the [CAC] shall preclude the right of de novo review on the merits of the issue of unreasonable anticompetitive conduct." § 12–36.5–106(7), C.R.S.2008. Subsection (8) provides: "Nothing in this article shall preclude a physician or health care provider otherwise aggrieved by the final action of a governing board from seeking other remedies available to them by law, except as provided in subsection (7) of this section." § 12–36.5–106(8), C.R.S.2008.

■ Defendants' argument would impose broader consequences on failure to exhaust CAC review than those provided for by the CPRA. The statutory consequence is to "preclude the right of de novo review on the merits of the issue of unreasonable anticompetitive conduct." § 12–36.5–106(7); *see*

§ 12–36.5–106(10)(b) (providing right to such review against hospital). Defendants' effort to preclude all claims, rather than just de novo review of the issue of unreasonable anticompetitive conduct, also runs up against subsection (8)'s express preservation of "other remedies available to" health care providers. § 12–36.5–106(8).

Defendants' argument is contrary to *Pfenninger v. Exempla, Inc.,* 17 P.3d 841 (Colo. App.2000) (*Pfenninger II* ), decided after the supreme court vacated and remanded *Pfenninger v. Exempla, Inc.,* 12 P.3d 830 (Colo. App.2000) (*Pfenninger I*). *Pfenninger II* held the doctor was not required to exhaust CAC remedies to bring a common law defamation claim arising out of a professional clinic's suspension of medical privileges. 17 P.3d at 843–44.

Defendants contend, however, that dismissal is required by *Crow v. Penrose–St. Francis Healthcare System,* 169 P.3d 158 (Colo.2007). We disagree. The "main issue" in *Crow* was "one of ripeness": whether a physician may file common law claims before "the Hospital's board makes its final decision." *Id.* at 163, 168. The court discussed the "two-track exhaustion requirement" established by CPRA section 12–36.5–106(7) and (8), "depending on whether the claim alleges anticompetitive conduct by the peer review committee." *Id.* at 165. Because both subsections require "final action," the court concluded a lawsuit filed before a final hospital decision is unripe regardless of whether it alleges anticompetitive conduct. *Id.* at 165–68.

*Crow's* holding does not support defendants' position because there is no ripeness issue here, as St. Mary's indisputably reached a final decision adverse to Dr. Peper. Nor are defendants aided by the "policy reasons for requiring administrative exhaustion": preserving "the Hospital's autonomy, which would be substantially compromised if" peer reviewers "could be sued while the review process was ongoing"; allowing "peer review committees to develop a factual record"; and preventing "fragmentation of the administrative process" and "delay[s]." *Id.* at 168. Requiring CAC exhaustion for

claims outside CAC jurisdiction would not further these policies but instead would cause unnecessary delays.

The only arguable support for defendants' position comes from language in *Crow* that, read out of context, could apply more broadly than warranted by the court's holding and rationale. Defendants emphasize the opinion's "conclusion that a physician subject to peer review *must exhaust all available administrative remedies outlined in the CPRA* before bringing any common law claims arising out of the process or final decision in court." *Id.* at 169 (emphasis added).

We decline to read this language in isolation. Elsewhere, *Crow* makes clear that exhaustion of claims governed by subsection (8) refers to the requirement of a final *hospital* decision. *See, e.g., id.* at 165 ("we hold that a physician must exhaust the administrative remedies of the CPRA, resulting in a final board action by the hospital"); *id.* at 168 (physician "has not exhausted his administrative remedies in the peer review process" "until the Hospital's board makes its final decision"). And *Crow* cited the reasoning in *Pfenninger* with apparent approval, noting its "posture was admittedly somewhat different." 169 P.3d at 167.

■ We hold that, after a final hospital decision, CAC remedies need not be exhausted to bring common law damages claims based on theories other than unreasonable anticompetitive conduct. This holding rejects defendants' argument that subject matter jurisdiction is lacking over the entire case as a result of Dr. Peper's failure to seek timely CAC review. We express no opinion on which, if any, specific claims or parts of the claims alleged in the current amended complaint involve anticompetitive conduct such that they may be subject to CPRA subsection (7) rather than (8).

## B. Defendants' Claimed Entitlement to HCQIA Immunity

### 1. The Four Prerequisites to Immunity

■ The HCQIA seeks to improve the quality of medical care by encouraging meaningful peer review to identify, discipline and report incompetent practitioners. *See* 42 U.S.C. § 11101 (congressional findings); H.R.Rep. No. 99–903, at 2 (1986), *reprinted in* 1986 U.S.C.C.A.N. 6393. It furthers this goal by granting qualified immunity from damages lawsuits against participants in medical peer review activities. *North Colorado Medical Center,* 27 P.3d at 837.

Title 42 U.S.C. § 11111(a)(1) grants immunity from damages for peer review actions meeting "all the standards specified in section 11112(a)." This latter section lists four standards as prerequisites to immunity. To defeat immunity, a plaintiff "need only show . . . that any one of these four standards was not met." *North Colorado Medical Center,* 27 P.3d at 839.

■ Three of the four immunity standards expressly require that peer reviewers have been "reasonable" in their "belief[s]," "effort[s]," and ultimate "action[s]." 42 U.S.C. § 11112(a)(1), (2) & (4). "Reasonableness is measured by an objective standard rather than a subjective, 'good faith' standard." *North Colorado Medical Center,* 27 P.3d at 838 (citing cases). These objective standards, applied with deference to professional judgments, do not "require that the conclusions reached by the reviewers were in fact correct." *Poliner v. Texas Health Systems,* 537 F.3d 368, 378 (5th Cir.2008) (citing *Imperial v. Suburban Hospital Ass'n,* 37 F.3d 1026, 1030 (4th Cir.1994)). Allowing "a doctor unhappy with peer review [to] defeat HCQIA immunity simply by later presenting testimony of other doctors of a different view from the peer reviewers" would render the statutory protections "a hollow shield." *Id.* at 379.

■ The inquiry under statutory standard (3), in contrast, is not one that threatens to invade the expert province of medical reviewers. Rather, it asks whether the adverse decision was taken "after adequate notice and hearing procedures [were] afforded to the physician involved or after such other procedures as [were] fair to the physician under the circumstances." 42 U.S.C. § 11112(a)(3). This is the classic type of due process inquiry, albeit of statutory rather than constitutional origin, typically left to courts.

### 2. Summary Judgment Standards Under the HCQIA

■ HCQIA immunity "is a question of law for the court to decide." *North Colorado Medical Center,* 27 P.3d at 838 (citing *Bryan v. James E. Holmes Regional Medical Center,* 33 F.3d 1318, 1332 (11th Cir.1994)). We "review de novo legal questions concerning immunity." *Id.; see generally Brodeur v. American Home Assurance Co.,* 169 P.3d 139, 146 (Colo.2007) ("We review a grant of summary judgment de novo.").

■ Consistent with the congressional goal of encouraging medical peer review, the HCQIA establishes a rebuttable presumption of immunity. *See* 42 U.S.C. § 11112(a). This "rebuttable presumption of § 11112(a) creates a somewhat unusual [summary judgment] standard." *Austin v. McNamara,* 979 F.2d 728, 734 (9th Cir.1992). A court should ask whether a fact-finder viewing the evidence most favorably to the plaintiff doctor reasonably could find by a preponderance of the evidence that at least one statutory requirement was not met. *See Singh v. Blue Cross/Blue Shield of Massachusetts, Inc.,* 308 F.3d 25, 32 (1st Cir.2002) (quoting *Austin* ). If so, defendants are not entitled to summary judgment.

### 3. The Complete Absence of Statutory Due Process

■ A "failure to provide a physician with adequate notice and fair procedures precludes immunity under the HCQIA." *Sugarbaker v. SSM Health Care,* 190 F.3d 905, 915 (8th Cir.1999). The statutory standard is whether defendants took action "after adequate notice and hearing procedures [were] afforded to [Dr. Peper] or after such other procedures as [were] fair to [him] under the circumstances." 42 U.S.C. § 11112(a)(3). Section 11112(b) details notice and hearing procedures "deemed" sufficient. These procedures provide a "safe harbor" to peer reviewers, *Poliner,* 537 F.3d at 381–82, but failure to afford them "shall not, in itself, constitute failure" to satisfy statutory due process. 42 U.S.C. § 11112(b).

■ Here, defendants indisputably took final action adverse to Dr. Peper without providing any notice his conduct even was under review. They provided Dr. Peper no opportunity to be heard before revoking his privileges and reporting him to the state medical board and the national data bank. Nor have defendants ever claimed there was some health emergency requiring immediate suspension of Dr. Peper's privileges under 42 U.S.C. § 11112(c).

■ Defendants rely on the HCQIA provision making immunity available where procedural "conditions are met (*or are waived voluntarily by the physician* )," 42 U.S.C. § 11112(b) (emphasis added). They argue Dr. Peper waived his HCQIA procedural rights when he agreed in applying for provisional hospital privileges to be bound by bylaws that provided no hearing rights to provisional staff. The medical staff bylaw relied on by defendants provides: "Any re-delineation of clinical privileges or other adverse action affecting a provisional member does not give rise to the hearing and appeal rights set forth in these Bylaws." Even assuming this provision is consistent with all other applicable bylaws, we hold it was insufficient as a matter of law to waive HCQIA rights.

■ Any waiver of HCQIA rights must be knowing and voluntary. In general, "[w]aiver is the intentional relinquishment of a known right...." *Department of Health v. Donahue,* 690 P.2d 243, 247 (Colo.1984); *accord United States v. Olano,* 507 U.S. 725, 733, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (quoting *Johnson v. Zerbst,* 304 U.S. 458, 464, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938)). And the HCQIA expressly requires that any waiver be made "voluntarily by the physician." 42 U.S.C. § 11112(b).

Contrary to defendants' contention, Dr. Peper would not have waived any HCQIA rights even if he agreed to be bound by a medical staff bylaw stating that actions against provisional staff do "not give rise to the hearing and appeal rights set forth in these Bylaws." This bylaw provision does not use any "waiver" language. In any event, the most it could be read to have waived was a right to hearing and appeal under the medical staff bylaws. There is a legally significant distinction between rights under a

hospital's or medical staff's own bylaws and those under the HCQIA.

Courts have distinguished between bylaw and HCQIA rights. Several cases hold a hospital's failure to comply with its own bylaw procedures does not defeat HCQIA immunity. *See, e.g., Poliner,* 537 F.3d at 380–81 ("HCQIA immunity is not coextensive with compliance with an individual hospital's bylaws," so "a failure to comply with hospital bylaws does not defeat a peer reviewer's right to HCQIA immunity from damages"); *Meyers v. Columbia/HCA Healthcare Corp.,* 341 F.3d 461, 469–70 (6th Cir.2003) (hospital entitled to HCQIA immunity "even assuming [it] did violate the bylaws, [because] the notice and procedures provided complied with the HCQIA's statutory 'safe harbor' "); *Bakare v. Pinnacle Health Hospitals, Inc.,* 469 F.Supp.2d 272, 290 n. 33 (M.D.Pa.2006) ("HCQIA immunity attaches when the reviewing body satisfies the requirements *under HCQIA,* regardless of its own policies and procedures.") (emphasis in original).

Just as noncompliance with hospital bylaws does not show noncompliance with the HCQIA, compliance with hospital bylaws does not show compliance with the HCQIA. This is because a peer review disciplinary action does more than terminate one physician-hospital relationship. Indeed, Congress intended the HCQIA to address "a national need to restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance." 42 U.S.C. § 11101(2). To that end, it *required* hospitals taking adverse peer review actions against physicians to report the actions to the state medical board and to a national data bank. *See* 42 U.S.C. §§ 11133(a)(1), 11 134(b); 45 C.F.R. § 60.9; *Brown v. Presbyterian Healthcare Services,* 101 F.3d 1324, 1328 n. 3 (10th Cir.1996).

Here, as required by the HCQIA and its implementing regulations, defendants reported Dr. Peper to the Colorado Board of Medical Examiners and the National Practitioner Data Bank. Dr. Peper alleges those reports prevented him from practicing not only at St. Mary's but also anywhere else. Congress required compliance with the HCQIA procedures in these circumstances precisely because it intended for such reports to be so consequential. *See* H.R.Rep. No. 99–903 at 11 ("it is the Committee's intent that physicians receive fair and unbiased review to protect their reputations and medical practices"), *reprinted in* 1986 U.S.C.C.A.N. 6393.

Accordingly, Dr. Peper's HCQIA rights to notice and hearing were not waived by his alleged acknowledgment that medical staff bylaws did not afford him hearing and appeal rights. We have assumed for purposes of this appeal only that the medical staff bylaws provided for ex parte proceedings. Nonetheless, in order for defendants to obtain statutory immunity, the HCQIA required that they accord statutory due process to Dr. Peper.

Finally, we reject defendants' argument that Dr. Peper waived his HCQIA rights by not timely appealing to the CAC. This argument confuses waiver with forfeiture. *Cf. Olano,* 507 U.S. at 733, 113 S.Ct. 1770 ("Waiver is different from forfeiture."). The HCQIA provides a specific example of how statutory hearing rights can be forfeited through inaction. 42 U.S.C. § 11112(b)(3)(B) ("the right to the hearing may be forfeited if the physician fails, without good cause, to appear"). That example, however, involves inaction *before* a final adverse action is taken against a physician. There is no basis for finding waiver or forfeiture based on inaction after statutory due process rights already have been denied and final action has been implemented.

## III. Conclusion

The judgment is reversed, and the case is remanded for further proceedings consistent with this opinion.

Judge TAUBMAN and Judge CARPARELLI concur.