*Notice: This opinion is subject to correction before publication in the PACIFIC REPORTER. Readers are requested to bring errors to the attention of the Clerk of the Appellate Courts, 303 K Street, Anchorage, Alaska 99501, phone (907) 264-0608, fax (907) 264-0878, email corrections@akcourts.us.*

THE SUPREME COURT OF THE STATE OF ALASKA

| | | |
|---|---|---|
| MICHAEL D. BRANDNER, M.D., | ) | |
| | ) | Supreme Court No. S-15933 |
| Appellant, | ) | |
| | ) | Superior Court No. 3AN-13-07697 CI |
| v. | ) | |
| | ) | O P I N I O N |
| PROVIDENCE HEALTH & | ) | |
| SERVICES — WASHINGTON, | ) | No. 7135 – November 25, 2016 |
| | ) | |
| Appellee. | ) | |
| | ) | |

Appeal from the Superior Court of the State of Alaska, Third Judicial District, Anchorage, Patrick J. McKay, Judge.

Appearances: Richard W. Maki and David H. Shoup, Tindall Bennett & Shoup, P.C., Anchorage, for Appellant. Robert J. Dickson and Peter A. Scully, Atkinson, Conway & Gagnon, Anchorage, for Appellee.

Before: Stowers, Chief Justice, Winfree and Bolger, Justices. [Fabe and Maassen, Justices, not participating.]

WINFREE, Justice.

## I.    INTRODUCTION

Providence Alaska Medical Center terminated Dr. Michael Brandner's hospital privileges without notice and an opportunity to be heard after determining he had violated hospital policy by failing to report an Alaska State Medical Board order requiring him to undergo an evaluation of his fitness to practice medicine. Dr. Brandner

unsuccessfully challenged this action through Providence's internal post-termination hearing and appeal procedures. Dr. Brandner then sued in superior court, seeking reinstatement and damages for, in relevant part, alleged due process violations both in the procedures used and in the substantive standard applied in his termination. The superior court ruled that Dr. Brandner's due process rights were not violated, that he was not entitled to reinstatement, and that under federal law Providence was entitled to immunity from his damages claims.

We affirm the superior court's decision concerning the substantive standard applied to terminate Dr. Brander; he therefore is not entitled to reinstatement or post-termination-hearing damages. But Dr. Brandner's due process rights were violated by the procedures Providence employed because he was not given the required notice and a hearing prior to the termination of his hospital privileges; we therefore reverse the superior court's decision on the pre-termination notice and hearing claim and its decision that Providence had damages immunity from this claim, and we remand for further proceedings.

## II.    FACTS AND PROCEEDINGS

### A.    Facts

Dr. Brandner had hospital privileges as a surgeon at Providence from 1995 to 2009, when he took a medical leave of absence because of a cardiac condition. He returned to work in March 2010 and Providence reinstated his hospital privileges, excepting hand surgery. Providence also gave Dr. Brandner a six-month exemption from emergency call duties. In November 2010 Providence reinstated Dr. Brandner's hand surgery privileges after reviewing his surgical cases and finding him competent, but kept in place the emergency call exemption.

In October 2010 the Alaska State Medical Board (State Board) ordered Dr. Brandner to undergo psychiatric and medical evaluations after receiving a complaint

that he had contacted someone in the Governor's office and made a threat involving a gun. The evaluations were part of the State Board's investigation into Dr. Brandner's "ability to practice medicine in a manner consistent with public safety," and he was required to complete them within 45 days. The State Board's order also stated:

> Failure to comply with this order will result in the automatic suspension of [Dr. Brandner's] license to practice medicine in Alaska and it will remain suspended until such time as the evaluations are completed and the results of the evaluations are reviewed by the [State] Board, and the [State] Board determines Dr. Brandner is able to practice medicine in a manner consistent with public safety.

Dr. Brandner timely complied with the order by undergoing a five-day evaluation in early December 2010 at the Menninger Clinic in Texas. The clinic found no evidence indicating he was unfit to practice medicine. Later in December the State Board closed its investigation without imposing any "further investigation or disciplinary action"; it sent Dr. Brandner confirmation of its decision in May 2011.

Doctors enjoying Providence hospital privileges are required to comply with policies set out in the Providence Code of Conduct and Medical Staff Bylaws. Policy MS 980-150(D) requires doctors to report to the chief of staff or the medical staff services department manager "any limitations, restrictions[,] or conditions of any sort imposed by a state board, health care entity[,] or agency with respect to the practitioner's practice . . . no later than thirty (30) days after a final order has been issued." The policy states that doctors who violate this reporting requirement "will be subject to an automatic termination" of hospital privileges. Dr. Brandner did not inform Providence's chief of staff or medical staff services manager about the State Board order, nor did he disclose his December 2010 evaluation at the Menninger Clinic.

Procedures for reviewing, investigating, and resolving concerns about doctors' clinical proficiency and professional conduct are governed by Providence policy

MS 980-100, referred to as the Investigation, Hearing, and Appeals Plan (Fair Hearing Plan). Under this policy the Providence Medical Staff Executive Committee (executive committee) is responsible for overseeing doctors' conduct. Concerns about a doctor's conduct are first presented to the executive committee; it then has authority to conduct peer reviews and make recommendations to the Providence Alaska Community Ministry Board (Providence Board) on granting, limiting, suspending, or terminating hospital privileges. The executive committee's recommendations generally do not by themselves affect a doctor's hospital privileges; the Providence Board receives the recommendation, considers the matter independently, and makes the ultimate decision. Some hospital policies, including the one at issue here, provide for automatic termination of hospital privileges if a doctor engages in specified conduct. An automatic termination recommendation triggers a process under MS 980-100 entitling the doctor to a hearing and an appeal. After the hearing and appeal procedures are exhausted the Providence Board's confirmation, modification, or rejection of the hearing bodies' recommendations becomes Providence's final decision.

In January 2011 the executive committee called Dr. Brandner to its monthly meeting to discuss his emergency call duties. The executive committee was concerned because Dr. Brandner had listed his name on the emergency call sign-up sheets despite not yet being authorized to resume those duties. During that meeting the executive committee was alarmed by Dr. Brandner's "disjointed" statements. The executive committee invited him to a second meeting in February to decide whether to investigate his fitness to practice medicine. At the February meeting Dr. Brandner's "rambling and confused" conduct again raised concerns that he might not be "medically fit," and the executive committee ordered him to undergo a "fitness for duty" evaluation at the Menninger Clinic.

Kim Pakney, Providence's medical staff services manager, called Dr. Brandner in March to arrange the evaluation. During this call Dr. Brandner disclosed to Pakney that he recently had been evaluated at the clinic. Pakney told Dr. Brandner that he could either undergo another evaluation or allow the executive committee to obtain the December 2010 evaluation records. Dr. Brandner chose to release his 2010 evaluation. According to Pakney's later testimony, Dr. Brandner did not mention the State Board's order during their conversation and instead indicated he had visited the clinic at his cardiac surgeon's suggestion. Dr. Brandner testified that he told Pakney he had gone to the Menninger Clinic "to pursue some things." Only when Pakney received Dr. Brandner's clinic records did she realize that he had undergone the evaluation pursuant to an order from the State Board. She immediately notified the Providence executive committee.

At its next meeting, on June 13 — without notice to or presence by Dr. Brandner — the executive committee voted to recommend termination of Dr. Brandner's hospital privileges for failure to report the State Board's order requiring him to submit to an evaluation. The executive committee determined that the order was a final order imposing a condition on Dr. Brandner's license, and that his failure to report the order to the chief of staff or the medical staff services department manager within 30 days constituted a violation of Providence policy MS 980-150(D).

In a June 17 letter Providence's chief executive officer notified Dr. Brandner that the executive committee "recommended the automatic termination of [his hospital] privileges and staff membership," that he had the right to a hearing, and that the Providence Board would "not be bound by the adverse recommendation made thus far." A few days later the Providence Board affirmed the executive committee's recommendation terminating Dr. Brandner's hospital privileges. Dr. Brandner timely requested a hearing. At oral argument before us the parties confirmed that

Dr. Brandner's privileges effectively were terminated June 17, before any hearing took place, and that after that date he was not allowed to practice at Providence.

**B.     Proceedings**

**1.     Providence Fair Hearing Panel proceedings**

In November 2011 Dr. Brandner received a one-day hearing before a three-doctor panel pursuant to Providence's Fair Hearing Plan. A former superior court judge presided as the hearing officer. Dr. Brandner was represented by an attorney, presented evidence, cross-examined Providence's witnesses, and testified on his own behalf. Providence's witnesses testified about the importance of physicians self-reporting conditions on their licenses because of the potential impact on patient care. Dr. Brandner argued that the State Board's order was not a "condition" on his license within the meaning of the Providence reporting policy. He argued instead that the order was a part of an "investigation," and stated that he did not believe the policy required reporting investigations.

The panel decided that the order did impose a "condition" on Dr. Brandner's license because "[t]he plain language of the . . . [o]rder . . . clearly advised Dr. Brandner that the continued viability of his license was conditioned upon his timely completion of [] psychiatric and medical evaluations at the Menninger Clinic." The panel also found Dr. Brandner's testimony regarding his interpretation of the hospital policy "less than credible" because: (1) he testified that he attended the Menninger Clinic to "pursue some things"; (2) Pakney testified that Dr. Brandner said he attended the clinic because his cardiac surgeon had recommended it; and (3) it was undisputed that Dr. Brandner actually attended the clinic because the State Board required it.

The panel concluded that because the State Board order plainly stated Dr. Brandner's license would be suspended if he did not comply, a responsible,

reasonable doctor would have reported the order or at least asked Providence for guidance on whether the order triggered Providence's self-reporting policy. It unanimously upheld the executive committee's recommendation and the Providence Board's decision terminating Dr. Brandner's hospital privileges, finding that they were "not arbitrary, capricious[,] or unsupported by substantial evidence."

## 2. Providence Appellate Review Committee proceedings

Dr. Brandner timely appealed the panel's decision to the Providence Appellate Review Committee (review committee) pursuant to the Fair Hearing Plan. The review committee, comprised of five members — none of whom had participated in the earlier proceedings — convened in March 2012.

The review committee upheld the hearing panel's decision by a 4-1 vote. In its decision the review committee noted that Dr. Brandner's reading of the hospital policy regarding the scope of "condition" was "plausible" but that the review committee's role was not to substitute its judgment for that of the hearing panel or to re-weigh the evidence. The review committee concluded that the hearing panel's actions complied with Providence's Fair Hearing Plan, were not arbitrary or capricious, and were supported by substantial evidence. One review committee member dissented, writing that the State Board's order was not a "final order" imposing "conditions" under Providence policy MS 980-150(D) and thus did not trigger the self-reporting requirement. The dissent expressed concern that the hospital policy was applied based in part on Dr. Brandner's fitness to practice and not just his failure to report the State Board order, and it noted that the failure to self-report alone typically would not result in automatic termination of privileges. After the review committee issued its report, the committee chair sent the Providence Board a letter recommending clarifying MS 980-150(D)'s language by adding some "interpretive guidance to illustrate the types of limitations, restrictions, and conditions that are intended to be included."

In April 2012, after considering the hearing panel's and the review committee's decisions upholding the executive committee's recommendation, the Providence Board affirmed the termination of Dr. Brandner's hospital privileges.

### 3. Superior court proceedings

In June 2013 Dr. Brandner filed suit in superior court against Providence, the doctors who made up the hearing panel, and the doctors on the executive committee who testified at his hearing. Dr. Brandner alleged breach of contract, due process violations, defamation, and other contract claims. He sought both declaratory and injunctive relief restoring his hospital privileges and substantial money damages. Providence and the doctors moved for summary judgment, asserting peer review immunity under both Alaska law[1] and the federal Health Care Quality Improvement Act (HCQIA).[2] Dr. Brandner opposed and cross-moved for partial summary judgment, arguing that Providence and the doctors were not entitled to immunity under either state or federal law and that his due process rights were violated. In February 2014 the superior court granted summary judgment in favor of the individual doctors, concluding that AS 18.23.020 immunized them from suit.[3] The court also granted summary

---

[1]     *See* AS 18.23.020 (limiting review proceedings participants' liability for damages or other relief if their review actions were not motivated by malice, were taken after reasonable efforts to ascertain the facts, and were taken with the reasonable belief that they were warranted).

[2]     42 U.S.C. §§ 11101-11152 (2012). Congress passed HCQIA in an effort to "restrict the ability of incompetent physicians to move from State to State without disclosure or discovery of the physician's previous damaging or incompetent performance" by encouraging physicians to engage in "effective professional peer review." 42 U.S.C. § 11101. In pursuit of this aim the HCQIA limits damages on professional review actions. 42 U.S.C. § 11111.

[3]     We later affirmed this decision in *Brandner v. Bateman*, concluding that
(continued...)

judgment in Providence's favor on Dr. Brandner's contract claims. The court denied Dr. Brandner's cross-motion for summary judgment on his due process claims against Providence.

Dr. Brandner's due process claims were tried without a jury. The superior court found that Dr. Brandner intentionally misled Providence by consciously hiding the State Board order that he undergo an evaluation, and that his "blatant dishonesty" and "lack of candor" raised substantial patient care issues. The court also concluded that when a hospital policy requires self-reporting a condition placed on a physician's state license, due process does not require a pre-termination hearing for failure to report in violation of that policy. Finally, the court concluded that Providence was entitled to immunity under HCQIA.

Dr. Brandner appeals, arguing that: (1) Providence's termination of his hospital privileges without pre-termination notice or hearing is a due process violation; (2) the post-hearing termination violated due process because it was based on an ambiguous policy applied arbitrarily and capriciously; and (3) Providence is not entitled to HCQIA immunity from his due process claims. Providence responds that: (1) the automatic termination of Dr. Brandner's hospital privileges is not a due process violation; (2) its hospital policy is not unduly ambiguous; and (3) under HCQIA it is immune from damages even if Dr. Brandner succeeds in his due process claims.

_____

        **3**        (...continued)
"the executive committee and hearing panel reasonably interpreted the policy" and "enforced the sanction explicitly indicated in the policy." 349 P.3d 1068, 1076 (Alaska 2015).

## III. STANDARD OF REVIEW

We review due process claims de novo, "adopting the rule of law most persuasive in light of precedent, reason, and policy."[4] Whether the HCQIA immunizes Providence from Dr. Brandner's due process claims is a question of law that we also review de novo.[5]

## IV. DISCUSSION

### A. Dr. Brandner's Due Process Rights Were Violated When His Hospital Privileges Were Terminated Without Pre-Termination Notice Or Hearing.

Although the parties dispute what process was due at certain points in the termination process, they agree that Dr. Brandner's admitting privileges trigger some form of due process protection.[6]

#### 1. Dr. Brandner did not waive his right to a pre-termination hearing.

Providence argues that Dr. Brandner waived his right to a pre-termination hearing by agreeing to be bound by MS 980-150, triggering an "automatic termination" without providing for a pre-termination hearing. The right to a pre-termination hearing, Providence argues, may be waived if a sufficient post-termination grievance procedure

---

[4] *Alyeska Pipeline Serv. Co. v. State, Dep't of Envtl. Conservation*, 145 P.3d 561, 564 (Alaska 2006).

[5] *Bryan v. James E. Holmes Reg'l Med. Ctr.*, 33 F.3d 1318, 1332 & n.24 (11th Cir. 1994); *see also Maness v. Daily*, 307 P.3d 894, 900 (Alaska 2013) (articulating the de novo standard of review in the federal qualified immunity context).

[6] *See Storrs v. Lutheran Hosps. & Homes Soc'y of Am., Inc.*, 609 P.2d 24, 28 (Alaska 1980) (holding quasi-public hospitals cannot violate due process standards in denying staff privileges).

is afforded.[7]  We previously have held that a waiver of constitutional rights must be knowing and voluntary, and even in civil cases "courts must indulge every reasonable presumption against their waiver."[8]  And although constitutional rights are subject to contractual waiver, such waiver must be clear.[9]  Courts have found clear waiver, for example, in collective bargaining agreements  representing "a reciprocal negotiation between forces with strengths on both sides, reflecting the reconciled interests of employer and employees, voluntarily entered into."[10]  But here Dr. Brandner had not entered into a reciprocal negotiation with Providence for his hospital privileges; the requirement of abiding by the hospital's policy to obtain privileges is more akin to a contract of adhesion.

Providence cites *Whitaker v. Houston County Hospital Authority* to support its proposition that a doctor can waive the right to a pre-termination hearing and, if waived, the automatic termination of hospital privileges would not violate the doctor's due process right.[11]  But in *Whitaker* the doctor "expressly waive[d] any procedural due

---

[7]     *See Storrs v. Municipality of Anchorage*, 721 P.2d 1146, 1150 (Alaska 1986) (providing collective bargaining agreement may alter covered employees' pre-termination rights in limited circumstances); *Antinore v. State*, 371 N.Y.S.2d 213, 217 (N.Y. App. Div. 1975) (finding collective bargaining agreements made by "a reciprocal negotiation between forces with strengths on both sides, reflecting the reconciled interests of employer and employees, voluntarily entered into" can waive due process rights).

[8]     *Lynden Transp. v. State*, 532 P.2d 700, 717 (Alaska 1975).

[9]     *Bowen v. N.C. Dep't of Human Res.*, 710 F.2d 1015, 1018 (4th Cir. 1983).

[10]     *Antinore*, 371 N.Y.S.2d at 217.

[11]     613 S.E.2d 664, 671-72 (Ga. App. 2005).

process rights" through a contract entered into directly with the hospital.[12] Here neither Providence policy MS 980-150 nor the document Dr. Brandner signed for his 2009 reinstatement at the hospital specifically mentioned waiving due process rights. Thus there is no evidence of a "conspicuous and unequivocal" intent by Dr. Brandner to waive his right to a pre-termination hearing. The superior court rejected Providence's waiver argument, finding "no language in [Dr. Brandner's application for privileges] referencing a general right to due process or dealing specifically with a physician's right to . . . a pre-termination hearing in professional review actions."

Like the superior court, we conclude that Dr. Brandner did not knowingly and clearly waive his due process rights merely by signing his reappointment application for hospital privileges. Thus Dr. Brandner maintained a protected property interest in his hospital privileges subject to due process if terminated.

> **2. Due process required that Dr. Brandner receive notice and an opportunity to be heard prior to the termination of his hospital privileges.**

Dr. Brandner contends that due process requires a hearing before deprivation of a constitutionally protected property interest in employment.[13] "We have consistently held that before the state may deprive a person of a protected property interest there must be a hearing . . . ."[14] The only exceptions to this pre-termination hearing requirement are in emergency situations or when "public health, safety, or

---

[12]     *Id.* at 667.

[13]     *See City of N. Pole v. Zabek*, 934 P.2d 1292, 1297 (Alaska 1997).

[14]     *Graham v. State*, 633 P.2d 211, 216 (Alaska 1981) (first citing *Etheredge v. Bradley*, 502 P.2d 146 (Alaska 1972); then citing *Frontier Saloon, Inc. v. Alcoholic Beverage Control Bd.*, 524 P.2d 657 (Alaska 1974)).

welfare require[s] summary action."[15]  Other courts have agreed that medical staff privileges are a valuable property interest and that notice and hearing should precede termination of these privileges absent an "extraordinary situation where a valid government or medical interest is at stake."[16]

Providence argues that Dr. Brandner was not entitled to a pre-termination hearing because the Providence policy contains explicit language that a violation of MS 980-150(D) results in "an automatic termination" and because of "Providence's compelling interest" in ensuring patient safety and the highest quality in medical care. Providence contends that Dr. Brandner received all the process to which he was entitled because:  (1) he had full and fair opportunity to make his arguments to a neutral hearing panel; (2) he had full and fair opportunity to appeal the hearing panel recommendation to a separate, neutral review committee and to the Providence Board, and both upheld the hearing panel's decision; and (3) Providence followed the policies and procedures Dr. Brandner had agreed to abide by.  But Providence's procedures *after* terminating a doctor's privileges do not remedy its failure to provide procedures *before* termination.

We previously confirmed the importance of a hearing before suspending or terminating a doctor's staff privileges because summary action amounts to "a stigma of medical incompetence" affecting the doctor's ability to maintain income and reputation, both during the period between the deprivation of privileges and a hearing as well as after the hearing.[17]  This stigma is compounded because federal law now

---

[15]  *Id.* (quoting *Frontier Saloon*, 524 P.2d at 661).

[16]  *Ne. Ga. Radiological Assocs., P.C. v. Tidwell*, 670 F.2d 507, 511 (5th Cir. Unit B 1982); *accord Shahewy v. Harrison*, 875 F.2d 1529, 1533-34 (11th Cir. 1989); *Osuagwu v. Gila Reg'l Med. Ctr.*, 850 F. Supp. 2d 1216, 1223 (D.N.M. 2012).

[17]  *McMillan v. Anchorage Cmty. Hosp.*, 646 P.2d 857, 864 (Alaska 1982).

requires that all terminations be reported to a national data bank.[18]  Acknowledging the competing interests between a doctor's capacity to maintain employment and a health care entity's interest in maintaining safe and qualified patient care, we have previously held that terminating hospital privileges before a hearing is "justified only where there is evidence that a physician's conduct poses a realistic or recognizable threat to patient care which would require immediate action by the hospital."[19]

Providence contends that Dr. Brandner's deceitfulness posed a realistic or recognizable threat to patient care; when a physician is dishonest and actively conceals licensing conditions, a hospital cannot address the undisclosed problems because it "simply does not know what it does not know" and thus cannot assess whether there might be a "realistic and recognizable threat" to patient care.  Providence maintains, as a patient safety matter, that physicians must comply with Providence's self-reporting policy and that failure to do so is "cause for deep concern."

Providence has a policy expressly authorizing an immediately effective "precautionary suspension" when a doctor presents an imminent danger to the health or safety of an individual or to the hospital's orderly operations, but this was not the policy followed when terminating Dr. Brandner's privileges.  As Pakney noted at the November 2011 hearing, there was no precautionary suspension because there was no determination that Dr. Brandner was an imminent danger to health or public safety.  The executive committee was aware that the Menninger Clinic had evaluated Dr. Brandner and found he was fit to practice.  Although this evaluation might not have considered other factors bearing on whether Dr. Brandner was an imminent threat to patient care, it is relevant to whether Providence actually terminated Dr. Brandner because it found that he posed a

---

[18]     42 U.S.C. §§ 11133, 11136; 45 C.F.R. § 60.1 (2013).

[19]     *McMillan*, 646 P.2d at 866.

threat to patient care. And the June 17, 2011 letter notifying Dr. Brandner of the executive committee's recommendation that his privileges be terminated made no mention of patient safety concerns.

It is possible, as Providence argues, that a physician's dishonesty might in some circumstances be sufficient cause for emergency termination. But here this speculative possibility — raised as a post hoc rationalization rather than a demonstrated contemporaneous concern in Dr. Brandner's case — does not rise to the level of a "realistic or recognizable threat" requiring an emergency termination of hospital privileges. We therefore disagree with the superior court and conclude that Providence violated Dr. Brandner's right to due process by terminating his hospital privileges without pre-termination notice and hearing.

**B.      Dr. Brandner's Due Process Rights Were Not Violated Through Arbitrary And Capricious Application Of An Ambiguous Hospital Policy.**

Dr. Brandner further claims that his due process rights were violated because Providence policy MS 980-150(D) is vague and ambiguous, and that Providence terminated his privileges in an arbitrary and capricious manner without regard to his reasonable policy interpretation or to whether terminating his hospital privileges was commensurate with the harm caused by breaching the policy.

Although we do not interfere with hospital policy determining the medical training and experience necessary to qualify for hospital privileges, courts may determine whether a hospital has followed its own policies and whether a decision regarding hospital privileges was made in accordance with basic principles of fairness and due process of law.[20] These principles require that: (1) the procedures employed are fair; (2) the standards are reasonable; and (3) the standards have not been applied in an

---

[20]      *Kiester v. Humana Hosp. Alaska, Inc.*, 843 P.2d 1219, 1223 (Alaska 1992).

arbitrary and capricious manner.[21] Due process further requires that "criteria established for granting or denying privileges not be vague and ambiguous, and that as established, they be applied objectively."[22] "A statute, rule, or policy may be deemed impermissibly vague for either of two discrete reasons: It fails to provide people of ordinary intelligence a reasonable opportunity or fair notice to understand what conduct it prohibits; or, it authorizes or encourages arbitrary and discriminatory enforcement."[23] Accordingly the inquiry before us is not whose policy interpretation is more reasonable, but whether the policy itself is so vague or ambiguous that it is susceptible to an arbitrary and capricious application.

### 1. The policy's application was clear.

The superior court concluded that Providence policy MS 980-150 is "clear enough." Dr. Brandner nonetheless contends that he found it ambiguous because its key terms could be interpreted differently by reference to state law. MS 980-150's operative provision requires doctors to report to Providence "any limitations, restrictions, or conditions of any sort imposed by a state board, health care entity or agency with respect to the practitioner's practice." Dr. Brandner argues that state law does not construe the State Board's order as a "disciplinary action" or a "condition," because such actions would have required that the State Board hold a hearing and none occurred in his case.[24]

---

[21]    *Id.*

[22]    *Id.* at 1225.

[23]    *Roberts v. Titus Cty. Mem'l Hosp.*, 129 Fed. Appx. 82, 86 (5th Cir. 2005) (citing *Chicago v. Morales*, 527 U.S. 41, 56-57 (1999)).

[24]    *See* AS 08.64.326(a) (requiring a hearing before imposing sanctions); AS 08.64.331(a)(6) (describing sanctions State Board may impose, including "limitations or conditions on the practice of a licensee"). Dr. Brandner's argument rests on the theory

(continued...)

-16-                                                                                          **7135**

Thus Dr. Brandner argues that under state law his practice was never limited in any way and that he cannot be faulted for his interpretation, especially when the State Board investigator had confirmed in his case's proceedings that his license "was not conditioned, limited, or restricted by the [State] Board."

Surviving a vagueness challenge requires "fair notice" of what is and what is not prohibited.[25] And here the superior court found that Dr. Brandner had more than "fair notice" of what MS 980-150 required; he had actual knowledge that the policy required him to report the conditions the State Board placed on his license. The superior court found that Dr. Brandner knew the self-reporting policy applied to his circumstances and knew he had an obligation to report the conditions placed on his license, and thus he knowingly violated the policy. Dr. Brandner does not challenge that finding. We therefore affirm the superior court's determination that the policy's application was clear to Dr. Brandner.

---

[24] (...continued) that Providence must interpret the word "conditions" in MS 980-150 exactly, and only, as the word is used by the State Board in AS 08.64.331(a). We find this argument unpersuasive — "limitations" and "conditions" do not necessarily have the same meaning under MS 980-150, a Providence hospital policy, as they do under AS 08.64.331(a)(6), a statute setting out State Board procedures. And the hospital policy does not mention the statute.

[25] *Roberts*, 129 Fed. Appx. at 86; *see Gottschalk v. State*, 575 P.2d 289, 290 (Alaska 1978).

## 2. The policy was not applied arbitrarily or capriciously.[26]

When concerns are raised about a hospital policy giving enforcing authorities excessive discretion, the policy should not be found impermissibly vague absent evidence that it has been arbitrarily applied.[27] And on the facts of this case, the hospital policy was not arbitrarily or capriciously applied. Dr. Brandner suggests that the ambiguity of the policy allowed Providence to enforce it in an arbitrary and capricious manner. As evidence that Providence had impermissibly broadened the scope of the policy and enforced it in an arbitrary and capricious manner, he points to testimony before the hearing panel from an executive committee member who took the view that the policy required reporting "investigations." Dr. Brandner's argument has no merit. The executive committee member's testimony did not persuade the hearing panel to conclude that investigations, as well as limitations, restrictions, and conditions, must be reported. The hearing panel in fact concluded that Dr. Brandner's hospital privileges were terminated because of his failure to report a "condition" the State Board imposed on his license, not because of his failure to report an investigation.

Dr. Brandner also points to the superior court's consideration of his other conduct violations as evidence that MS 980-150 is ambiguous about what constitutes a "condition," arguing that the policy's fundamental ambiguity allowed it to be applied arbitrarily. Specifically, Dr. Brandner argues that it was improper for the superior court to consider the fact that he signed up for emergency call duty when he was restricted

---

[26] *See Roberts*, 129 Fed. Appx. at 86 (holding a rule may be deemed impermissibly vague if "it authorizes or encourages arbitrary and discriminatory enforcement" (citing *Chicago v. Morales*, 527 U.S. 41, 56-57(1999))); *see also Morales*, 527 U.S. at 60 (defining an arbitrary and discriminatory application as one that "necessarily entrusts lawmaking to the moment-to-moment judgment" of the enforcer).

[27] *See Stock v. State*, 526 P.2d 3, 8, 12 (Alaska 1974).

from doing so. But the superior court stated that Dr. Brandner's alleged misconduct was *not* the basis for the Providence executive committee's recommendation to terminate his privileges and that the hearing panel gave the misconduct evidence "no weight" in upholding the decision. We therefore affirm the superior court's determination that the policy was not applied arbitrarily or capriciously.

### 3. There is no history of arbitrary and capricious application.

In the context of due process challenges to statutes and regulations, we will not invalidate a statute for vagueness absent "a history or pattern of arbitrary enforcement."[28] Although we do not need to consider whether this standard is applicable beyond that context, we nevertheless note that Dr. Brandner failed to identify a pattern of Providence arbitrarily enforcing MS 980-150. And the Providence review committee, in its letter to the Providence Board recommending review of the policy, wrote that the review committee had no reason to believe Providence had interpreted MS 980-150(D) differently for different physicians in the past or was likely to do so in the future.

### 4. Summary

Because Providence policy MS 980-150 was not vague or ambiguous with respect to Dr. Brandner or on its face, and because it was not applied in an arbitrary and capricious manner to Dr. Brandner or historically, we cannot conclude that Providence applying the policy in terminating Dr. Brandner's hospital privileges violated his due process rights. Dr. Brandner therefore is not entitled to reinstatement or post-termination-hearing damages.

---

[28] *Storrs v. State Med. Bd.*, 664 P.2d 547, 552 (Alaska 1983) (refusing to invalidate a statute when the defendant physician could not identify any instances of arbitrary enforcement by the State Board); *see also Stock*, 526 P.2d at 12 ("While we may be able to conceive of instances in which the statute could be arbitrarily and capriciously enforced, we cannot on the basis of such mere hypothesis, in the absence of any history of actual arbitrary application, invalidate the statute.").

**C.** **Providence Does Not Qualify For HCQIA Immunity With Respect To The Termination Of Dr. Brandner's Privileges Without Notice And A Hearing.**

Congress enacted HCQIA to improve the quality of health care and reduce the number of incompetent physicians.[29] Congress determined that both goals could be attained through "effective professional peer review."[30] Accordingly HCQIA eliminates some deterrents to effective professional peer review of physician competence by providing immunity from damages to "professional review bodies" and individuals acting in support of those bodies.[31] Immunity under the act covers only liability for damages; it does not shield covered defendants from lawsuit or from other forms of relief.[32]

For HCQIA to immunize Providence from damages resulting from a professional review action, the hospital must satisfy all four elements set forth in 42 U.S.C. § 11112(a), providing:

> For purposes of the protection set forth in section 11111(a) of this title, a professional review action must be taken —
>
> > (1) in the reasonable belief that the action was in the furtherance of quality health care,

---

[29] *See* 42 U.S.C. § 11101.

[30] *Id.*

[31] *See id.* § 11111(a)(1)-(2); *see also* 42 U.S.C. § 11151(11) (defining "professional review body" as "health care entity"), § 11151(4)(A) (defining "health care entity" as licensed hospital); *Decker v. IHC Hosps., Inc.*, 982 F.2d 433, 436 (10th Cir. 1992) (exploring scope of immunity provided by § 11111(a)).

[32] 42 U.S.C. § 11111(a)(1) (specifying immunity from damages only and not mentioning other relief); *Singh v. Blue Cross/Blue Shield of Mass., Inc.*, 308 F.3d 25, 35 (1st Cir. 2002).

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

A professional review action shall be presumed to have met the preceding standards necessary for the protection set out in section 11111(a) of this title unless the presumption is rebutted by a preponderance of the evidence.[33]

Federal courts have granted hospitals immunity under the Act when they clearly establish that "a full and fair peer review process was used" in connection with denying hospital privileges to a physician.[34] Under HCQIA "a professional review body (including a hospital), its members, its staff, and others under contract with it are immune from damages liability with respect to the body's actions."[35] Here there is no dispute that Providence is a "health care entity" contemplated by HCQIA,[36] and its claim for protection arose from a peer review process for the purpose of furthering quality

---

[33] 42 U.S.C. § 11112(a).

[34] *Ezekwo v. Am. Bd. of Internal Med.*, 18 F. Supp. 2d 271, 277 (S.D.N.Y. 1998), *aff'd* 174 F.3d 844 (2d Cir. 1999).

[35] *Sobel v. United States*, 571 F. Supp. 2d 1222, 1229 (D. Kan. 2008); *see also Rodgers v. Columbia/HCA of Cent. La., Inc.*, 971 F. Supp. 229, 233 (W.D. La. 1997) (finding the hospital immune because it is a health care entity engaged in a professional review activity).

[36] *See* 42 U.S.C. § 11151(4)(A)(ii) (using the term "health care entity" to describe an organization like Providence).

healthcare. Dr. Brandner argues that Providence did not satisfy the notice and hearing prerequisite for immunity because he was not given notice or hearing prior to his termination.[37]

Dr. Brandner's rebuttal of Providence's HCQIA immunity presumption focuses on § 11112(a)(3), requiring that a professional review action be taken "after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances." The superior court found Providence met § 11112(a)(3)'s requirement by providing Dr. Brandner "post-suspension, but pre-termination" fair hearing. But Dr. Brandner contends Providence did not provide him "adequate notice and hearing procedures" *prior* to terminating his hospital privileges, and thus HCQIA immunity cannot attach to Providence's initial termination action.

Providence claims that prior to its terminating Dr. Brandner's hospital privileges he had waived his right to notice and hearing because he had agreed to be bound by hospital bylaws. But waivers cannot release a hospital from HCQIA requirements to achieve immunity. A Colorado Court of Appeals case is instructive. In *Peper v. St. Mary's Hospital & Medical Center* a hospital took final action adverse to a doctor without providing notice that his conduct was under review.[38] The hospital gave "no opportunity to be heard before revoking his privileges and reporting him to the state medical board and the national data bank," and it never claimed any health emergency requiring the immediate suspension of his privileges.[39] The hospital argued that because the doctor had agreed to be bound by its bylaws and because the bylaws did not provide

---

[37]     *See id.* § 11112(a)(3), (b).

[38]     207 P.3d 881, 888 (Colo. App. 2008).

[39]     *Id.*

-22-                                    7135

for notice and hearing prior to a final decision, the hospital had adequately met HCQIA's notice and hearing requirement.[40] But the court disagreed, holding that a hospital's compliance with its bylaws may nonetheless be insufficient as a matter of law to meet HCQIA immunity requirements.[41] Immunity attaches when the professional review action satisfies HCQIA requirements, regardless of the hospital's own procedures.[42] Signing hospital bylaws did not waive the doctor's right to adequate notice and hearing under HCQIA statutory provisions.[43] The court concluded that the hospital failed to provide the doctor adequate notice and hearing under § 11112(a)(3), and thus it denied the hospital HCQIA immunity from the doctor's claims.[44]

The facts here are similar. Providence did not provide notice and hearing to Dr. Brandner before the executive committee considered and recommended terminating his hospital privileges at its June 13, 2011 committee meeting. Although notice, a hearing, and an appeal took place after the actual June 17 termination of Dr. Brandner's privileges, these procedures are insufficient to satisfy § 11112(a)(3)'s requirement that adequate notice and hearing procedures must be afforded to the physician *before* the professional review action is taken. Providence could have provided some kind of notice and an opportunity for Dr. Brandner to be heard before June 17, 2011, but it did not.

---

[40] *Id.* at 884, 888.

[41] *Id.* at 888.

[42] *Id.* at 889.

[43] *Id.* at 888.

[44] *Id.* at 886-89.

Providence asserts that it nevertheless met § 11112(a)(3)'s requirements because Dr. Brandner was afforded "other procedures as are fair" under the circumstances when he received a hearing and an appeal after the termination of his privileges. But HCQIA specifies that a professional review action must be taken "*after* such other procedures as are fair to the physician under the circumstances."[45] The professional review action at issue is the June 17, 2011 termination of Dr. Brandner's hospital privileges. This action took place *before* the hearing panel and the review committee proceedings. As in *Peper*, Dr. Brandner did not waive his right to the adequate notice and hearing required under HCQIA.[46] Thus the hearing and the appeal provided after the termination cannot be construed as "other . . . fair" procedures satisfying § 11112(a)(3)'s notice and hearing requirement. And Providence conceded at oral argument that if it had violated Dr. Brandner's due process rights in this context it was not entitled to HCQIA immunity. Accordingly, Dr. Brandner rebutted the presumption that this element of the four statutory requirements was met.

We therefore reverse the superior court's conclusion that HCQIA immunity applies to the due process violation arising from terminating Dr. Brandner's hospital privileges without proper notice and opportunity to be heard.[47] We remand for further proceedings on Dr. Brandner's claim for damages with respect to this due process violation.[48]

---

[45]     42 U.S.C. § 11112(a)(3) (emphasis added).

[46]     *See Peper*, 207 P.3d at 889.

[47]     Because of this decision we do not need to address other HCQIA issues Dr. Brandner raised on appeal.

[48]     *See City of N. Pole v. Zabek*, 934 P.2d 1292, 1299 (Alaska 1997) (awarding damages for period between wrongful termination and curative post-termination
(continued...)

## V.  CONCLUSION

We AFFIRM the superior court's termination claim decision; we REVERSE the pre-termination notice claim decision and REMAND to the superior court for further proceedings consistent with this decision.

---

[48]  (...continued)
hearing).